No. 46,776

STATE OF KANSAS, *Appellee* v. CHARLES F. RITSON, *Appellant.*

(504 P. 2d 605)

Opinion filed December 9, 1972.

*Roger D. Hughey,* of Smith, Shay, Farmer and Wetta, of Wichita, argued the cause and was on the brief for the appellant.

*David P. Calvert,* deputy county attorney, argued the cause, and *Vern Miller,* attorney general, *Keith Sanborn,* county attorney, and *Larry Kirby,* deputy county attorney, were on the brief for the appellee.

The opinion of the court was delivered by

FOTH, C.: Charles F. Ritson was convicted of two counts of aggravated robbery and he appeals. Trial errors are claimed which relate separately to each count, and each will therefore be separately discussed.

I

On October 30, 1970, at about 8:00 or 8:30 p. m., two armed men wearing masks robbed the Town and Country Food Market in Wichita at gunpoint, while a third man waited outside in a car. Employees of the store testified that the defendant looked like one of the masked men, although their identification was far from positive.

A detective, alerted by radio, was en route to the scene in his patrol car when he saw a man running across the street about a block away from the market. He called out to stop, gave chase on foot, fired a warning shot, and finally caught up with the man about a block and a half away from the scene of the robbery. The man arrested, the defendant, had a dollar bill and some loose change in his pocket. The householder in whose yard the arrest was made found a number of quarters—eighty, to be exact—in the grass the next morning.

At police headquarters that evening the defendant discussed his earlier activities with Detective Gary Caldwell. (No contention is made that there was any unlawful interrogation.) His story to Caldwell at that time was, in essence: that he was at home when he received a call from an old friend named Shirley asking him to meet her at a nearby tavern; he did, and after a couple of beers the two of them went in Shirley's car to another tavern; while they were sitting in a booth there Shirley told him not to turn around, that her husband had just walked in; they managed to exit and were on foot when they encountered a car; he thought it was the husband and ran; after he was shot at he stopped, and then discovered that his pursuer was a policeman.

Detective Caldwell promptly set out to check defendant's alibi, and it is his testimony concerning the manner in which he did so that gives rise to the chief claim of error on this count. Before permitting the testimony to go to the jury the trial court conducted an *in camera* hearing at which Caldwell testified that on the night of the robbery he and another detective took the defendant in a

police car to search for the second tavern. In due course defendant identified the Lamplighter as the site of his interrupted tryst with Shirley, and they parked while Caldwell went in the tavern. He came out with a waitress and, according to his testimony, the following took place:

"Q. And did you have any conversation with her in the presence of the defendant?

"A. Yes, sir.

"Q. What was that conversation?

"A. I asked her—I brought her out to the car where Mr. Ritson was sitting. I opened the door and she looked at him and I said, 'Have you seen this man before,' and she said, 'I've never seen the man in my life.' I said, 'Has he been in the tavern tonight, and she says, 'No.' She says, 'Everybody that's been in tonight is customers that I know,' and she said, 'There hasn't been any strangers in at all,' and she came to work at 6:30.

"Q. And Mr. Ritson was present during that conversation?

"A. Yes, sir, he was sitting in the front of the car."

Defense counsel objected to this testimony going to the jury on the ground that it was "hearsay and unfairly prejudicial." After hearing argument the trial court overruled the objection and ruled that it would admit the testimony—on condition the state furnish defense counsel the name, address and telephone number of the waitress. This was done, she being identified as Mrs. Tsianina R. Good.

Still out of the presence of the jury, on cross-examination, Caldwell testified that the defendant may have said something to the waitress at the car but that he did not remember.

With this background the trial court permitted Caldwell to repeat the whole story to the jury and by doing so committed what we regard as reversible error.

There can be no doubt that this testimony was highly prejudicial. If Mrs. Good's statements were to be believed they effectively forestalled any alibi by the defendant and made him out a liar as well. It is equally clear that her statements to the officers were pure hearsay, i. e., they were made by a person other than the witness and "offered to prove the truth of the matter stated" (K. S. A. 60-460.) The purpose of the offer obviously was that the jury should believe that defendant was not in the tavern, where he said he was and where Mrs. Good said he wasn't.

As hearsay the testimony was inadmissible unless it came within one of the statutory exceptions. At trial the state offered no specific theory that we can ascertain from the record, although the court's

condition that defense counsel be furnished Mrs. Good's name, address and telephone number might indicate reliance on K. S. A. 60-460 (*a*), dealing with persons who are present and available for cross-examination. At all events, in this court the state relies exclusively on K. S. A. 60-460 (*h*) which makes admissible:

"As against a party, a statement . . . (2) of which the party with knowledge of the content thereof has, by words or other conduct, manifested his adoption or his belief in its truth. . . ."

The question is whether the defendant "by words or other conduct" adopted Mrs. Good's statements or indicated his belief in their truth. We think the evidence is sorely deficient on this point.

It is clear defendant did not expressly adopt Mrs. Good's statements. If he had, we would have the situation found in *State v. Greer*, 202 Kan. 212, 447 P. 2d 837, our only decision dealing with adoptive admissions since the enactment of the present statutory rules of evidence. There the defendant listened to a tape recording of his codefendant's statement and acknowledged its veracity; the statement was held to be admissible as the defendant's own adoptive admission. What the trial court here did not know when it made its ruling was whether defendant denied the statements or maintained silence. Had he denied her statement, it would have been inadmissible under any theory. The closest thing to evidence of *any* reaction was Caldwell's testimony that he couldn't remember whether defendant said anything or not.

There is, of course, a long standing rule that silence in the face of an accusatory statement, under circumstances calling for a denial by an innocent man, may be introduced as evidence of guilt—at least where such silence is not the product of the exercise of a constitutional right. Compare *State v. Shaw*, 195 Kan. 677, 408 P. 2d 650, and *State v. Moskowitz*, 115 Kan. 485, 223 Pac. 279, with *State v. Bowman*, 204 Kan. 234, 461 P. 2d 735 and *State v. Dearman*, 198 Kan. 44, 422 P. 2d 573. The general rule is aptly summarized in 29 Am. Jur. 2d, *Evidence*, § 638:

"The uncertainty which attends interpreting an accused's silence as an implied admission of the statement made, or as exhibiting a consciousness of guilt, has led courts to consider such evidence as dangerous and to be received with caution. Recognizing that at its best, the doctrine of assenting silence brings about the weakest assumption known to the law, the courts generally have imposed conditions upon the introduction of evidence that an alleged admission by silence has occurred. To constitute proof of an admission by silence the evidence must disclose that (1) the statement was extrajudicial; (2) it was incriminatory or accusative in import; (3) it was one to which an

innocent man would in the situation and surrounding circumstances naturally respond; (4) it was uttered in the presence and hearing of the accused; (5) he was capable of understanding the incriminatory meaning of the statement; (6) he had sufficient knowledge of the facts embraced in the statement to reply thereto; and (7) he was at liberty to deny it or reply thereto."

But it is said that "The statement must be specific as to a criminal act charged against the defendant." (Vol. 2 Wharton's Criminal Evidence, *Confessions and Admissions,* § 405, pp. 156-157.) Further, "The inference or conclusion of guilt cannot be drawn from the defendant's silence if there is any other interpretation equally consistent with his silence. It cannot be drawn if the defendant denies the statement, and in such case, the accusatory statement is itself inadmissible." (Id., p. 157.)

Here, Mrs. Good made no specific accusation against the defendant, but merely stated she did not know him—a conclusion embellished by her account of when she came to work and her acquaintance with all the tavern "regulars." Assuming defendant was silent in the face of this entire account, we can conceive of several inferences other than his acquiescence in or wholesale adoption of it. He might have shrugged her story off as a lie or a mistake; he could have been there and she might have not seen him or have forgotten; he might have been served by another waitress; or he might have concluded that he had the wrong tavern. Any of these, we think, might have resulted in silence—if that was in fact his response. Learned commentators note that before admitting hearsay under this provision of the statute "An affirmative finding must be made that the declarant actually intended to assent to the truth of a statement made by another." (Vol. 4 Vernon's Kansas Statutes Annotated, Code of Civil Procedure, *Rules of Evidence,* § 60-460, p. 484.) We do not see how the trial court could have made such an affirmative finding on the ambiguous state of the record.

It may be suggested that the omission in the foundation for this hearsay was supplied by defendant when he testified in his own defense. He related the encounter with Mrs. Good as follows:

"Q. All right. Did you go out with him to the Lamplighter?

"A. Yes, I did.

"Q. Do you remember the girl coming out?

"A. Yes, I do.

"Q. What happended when the girl came out of the Lamplighter?

"A. I was sitting in the back seat and he brought her out to the car and asked her if she had ever seen me before and she looked awhile and I think she said, 'I don't believe so,' or she said no anyways.

"Q.  All right.

"A.  And—

"Q.  Did you say anything to her?

"A.  No, I said to her and to Detective Caldwell, 'I've never seen her before either.'

"Q.  And then what happened?

"A.  Oh, he got kind of mad and said, 'You're putting a story on me,' and took me to the police station."

We cannot read his comment as he relates it as an adoption of Mrs. Good's statement. The best that can be said of it is that it acknowledges that they didn't know each other. We think his own version results in the same ambiguity as would silence.

We might concede that the portion of Mrs. Good's statement to the effect that she could not identify defendant was "adopted" by defendant under his version of the encounter—although his version was not before the trial court at the time admissibility was determined. But this would not change the result. The really damaging portions of her statement related to when she came to work, her continuous presence throughout the evening, and her familiarity with all of the evening's customers. Without these added ingredients Mrs. Good's statement would have had but slight probative value on the question of whether defendant was in the tavern that night. "In order that any significance may attach to the failure of a party to reply to a statement he must have been possessed of knowledge concerning the subject matter of the statement sufficient to enable him to reply if he was inclined to do so." (31A C. J. S., *Evidence*, § 295, p. 757.) The crucial factors of Mrs. Good's statement were all outside of defendant's knowledge. He therefore could not be expected to affirm or deny them, and no inference could be drawn from his mere silence. (See also, 29 Am. Jur. 2d, *Evidence*, § 638, *supra.*)

We are constrained to hold that the admission of this testimony was error. It seems to us that this case affords a classic illustration of the situation the hearsay rule was formulated to prevent. No reason is given why the state did not produce Mrs. Good. She was apparently available, since the state complied with the court's condition that it furnish her name, etc. But this information was no substitute for her testimony, live from the witness stand and subject to cross-examination. We think this is what the defendant had a right to expect and what the rules of evidence demand.

Defendant makes a similar claim with respect to an encounter between himself and the "Shirley" he was supposed to have been

with on the night of the robbery. It appears, however, that this episode was first injected into the case through defendant's own testimony. The state's version, which did not vary substantially from his, came in only on rebuttal. Defendant is in no position to claim error under these circumstances. *State v. Nirschl*, 208 Kan. 111, 490 P. 2d 917, Syl. ¶ 6; *State v. Burgess*, 205 Kan. 224, 227, 468 P. 2d 229.

## II

The second robbery involved a Quick Shop food store in Wichita, and occurred at about 9:00 p. m. on November 18, 1970. Of the two men who actually held up the store neither was the defendant; one was identified by a clerk as a Marshall W. White.

Detective Caldwell testified that at about 8:36 p. m. that night he observed defendant and White with another man in a yellow 1970 Ford Torino in the vicinity of the Quick Shop. Detective Ed Miller testified that at about 9:19 p. m. he arrived in Valley Center, a community near Wichita, and found defendant, White, and an Eddy Robinson pulling into a driveway in a 1970 yellow Ford Torino. He pulled in behind. Defendant got out on the driver's side, the other two on the right side. A sack containing checks from the Quick Shop was on the console between the front seats, a .45 caliber automatic was under the passenger seat, and another pistol was found on the grass near the car.

Defendant testified that the night the Quick Shop was robbed he, White and Robinson had gone to a horse auction near his home at about 7:00 p. m. He was there all evening, but White and Robinson left for a while, coming back for him about 9:00. They all then went to Robinson's home in Robinson's yellow Torino, where they were arrested. He knew nothing of the Quick Shop robbery.

The primary claim of error on this count relates to Detective Caldwell's testimony on rebuttal. He had talked to the defendant about his activities that night and had been told of going to the horse auction. Detective Caldwell continued:

". . . I asked him if they all three stayed at the auction and he said that they did. I asked him if at any time did Mr. White and Robinson leave the auction without him and he said no. I said at any time did they leave your sight or the vicinity you were in at the auction and he said definitely not. He said they all three stayed in the auction up until a little after 9:00 where they went straight back to Valley Center. I then approached him in the manner—or I told him that I had seen them in Wichita at 29th and Amidon *and he had no answer.* I said if I told you that I had seen you, and  . . .

gave him the time that I seen him at 8:40 p. m., I said, are you saying this would be incorrect? *And he had no answer. He wouldn't say anything. As a matter of fact, this is when I stopped talking to him. He asked for an attorney.* (Emphasis added.)

[Defense Counsel]: I object to that, Your Honor, and move for a mistrial.
THE COURT: Overruled."

There can be no doubt that the interjection of this evidence was error. Its sole purpose was to show that when defendant was confronted with evidence contradicting his alibi he had refused to talk and demanded counsel. It was clearly a use of defendant's invocation of his constitutional rights to silence and to counsel as substantive evidence of guilt—otherwise it had no probative value as rebuttal of defendant's story. Such a use is not permissible under *Miranda v. Arizona,* 384 U. S. 436, f. n. 37, 16 L. Ed. 2d 694, 86 S. Ct. 1602, 10 A. L. R. 3rd 974; and our own holding in *State v. Bowman,* 204 Kan. 234, 461 P. 2d 735; and *State v. Dearman,* 198 Kan. 44, 422 P. 2d 573. Cf. *Griffin v. California,* 380 U. S. 609, 14 L. Ed. 2d 106, 85 S. Ct. 1229; *Chapman v. California,* 386 U. S. 18, 17 L. Ed. 2d 705, 87 S. Ct. 824.

The only question here is whether it is harmless error. The error being of constitutional character, it is not harmless if "there is a reasonable possibility that the evidence complained of might have contributed to the conviction." *Fahy v. Connecticut,* 375 U. S. 85, 86-7, 11 L. Ed. 2d 171, 84 S. Ct. 229. Put another way, to be harmless it must be "harmless beyond a reasonable doubt." *Chapman v. California,* supra, 386 U. S. at 24. The latter case also holds that this is a constitutionally imposed standard for determining whether error may be deemed harmless.

While there is room for a "harmless error" argument, when this error is combined with the error under Part I above—with its devastating effect on defendant's credibility which may well have permeated the entire trial—we cannot say that there is not at least a reasonable possibility that it affected the verdict. It follows that the conviction on this count must also be reversed.

In view of the conclusion reached it is unnecessary to consider defendant's additional contention that the trial court permitted redirect examination beyond the scope of the direct. In any event we find no abuse of discretion which would have required reversal on this point alone.

The judgment is reversed and the case remanded for a new trial on both counts.

APPROVED BY THE COURT.

FROMME, J., dissenting: The harmless error rule should be applied in this case and the case should be affirmed.

The evidence of defendant's participation in these crimes was overwhelming. The errors upon which the case is reversed relate only to testimony of Detective Caldwell which indicates he made a diligent effort to check out the defendant's alibi stories. The purpose of this testimony was not to establish the elements of the crimes but to question the credibility of defendant. When defendant took the stand to testify he admitted that he was interviewed by Detective Caldwell, that he told the detective what Detective Caldwell had previously testified to, but that the truth about his actions was yet another story. Under such circumstances the truth of the previous alibi stories was no longer an issue in the case. Since during the trial defendant testified that his first stories were not true the harmless error rule should be applied. This relates to Caldwell's attempts to check with Mrs. Good and Shirley on the original alibi stories. In my opinion this testimony did not in any way affect the outcome of the prosecution and the error was harmless beyond a reasonable doubt.

The admission of the testimony of Detective Caldwell as to defendant's silence when discussing his horse auction alibi was harmless to the same extent. At the crucial time when the Quick-Shop robbery occurred defendant testified he and his co-defendants left the auction and drove to Valley Center where they were arrested.

None of this testimony related to proof of the crimes. None related to defendant's participation in the crimes. There was overwhelming evidence of defendant's guilt and of his lack of credibility. The evidence was erroneous, it was unnecessary but in my opinion it was harmless beyond a reasonable doubt.

FONTRON and KAUL, JJ., join in the foregoing dissent.