Paul Steven JERSKEY, Appellant
(Defendant below),

v.

The STATE of Wyoming, Appellee
(Plaintiff below).

No. 4465.

Supreme Court of Wyoming.

Jan. 27, 1976.

Edward P. Moriarity of Urbigkit, Moriarity, Halle & Mackey, P. C., Cheyenne, for appellant.

David B. Kennedy, Atty. Gen., Timothy J. Judson, Sp. Asst. Atty. Gen., Cheyenne, and Robert Wilson, Sr. Law Student, for appellee.

Before GUTHRIE, C. J., and Mc-CLINTOCK and ROSE, JJ.

ROSE, Justice.

I

## THE PRIVILEGE AGAINST SELF–IN-CRIMINATION

On June 11, 1974, a complaint was filed against the defendant, Jerskey, amending one formerly filed May 15, 1974. The later complaint contained two counts with which we are concerned here. The first alleged *possession* of a controlled substance with intent to deliver under § 35–347.-31(a)(ii), of the Wyoming Controlled Substances Act of 1971; the second charged the appellant with *attempting to possess* a controlled substance with intent to deliver, in violation of § 35–347.42 of the Wyoming Controlled Substances Act of 1971. Both provisions of the statute are contained in W.S.1957, 1975 Cum.Supp.

The appellant was bound over and arraigned on both counts of the amended complaint. He pled not guilty to each, whereupon the trial was had commencing July 8, 1974, and Mr. Jerskey was found guilty and sentenced to prison on both charges. From this the appeal followed. Other facts will be discussed in the course of the opinion.

### Right to Silence

One of the issues to which our attention is directed is described in appellant's brief as follows:

"B. The defendant's exercise of his constitutional Fifth Amendment right to remain silent was utilized to penalize him, and the result thereof has such a chilling effect on the appellant's use of his constitutional rights that it is fundamental reversible error."

The problem is of interest—not because it is new or unique—but because the gener-

al area with which it is concerned has been here so many times before.[1]

The subject is considered in depth by the United States States Supreme Court in *Escobedo v. State of Illinois*, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964), and *Miranda v. State of Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).[2] It pertains to some fundamental constitutional rights, both federal and state. Why the philosophy of the Fifth Amendment and the *Miranda* treatment of custodial interrogation present such a dilemma to the Bar and Bench is a guessing game in which there are as many guessers as there are lawyers and judges.

*Escobedo* wasn't that vague—*Miranda* was definitive enough—and yet the privilege against self-incrimination, in its testing, continues to be stretched until it snaps so that new, expensive trials are necessary because the officials who are concerned with the problem are reluctant to accept the United States Supreme Court's mandates in *Escobedo* and *Miranda* and to adopt the spirit and letter of the decisions of this court as we have interpreted these Fifth Amendment doctrines.

The theory of the privilege against self-incrimination is a good, high-principled concept aimed at the preservation of the very most basic of the individual's rights in a democratic society and one which should be readily embraced by all of us. Why is it so difficult to accept and love?[3]

In *Miranda*, referring to *Escobedo*, the United States Supreme Court said:

". . . That case was but an explication of basic rights that are enshrined in our Constitution—that 'No person * * shall be compelled in any criminal case to be a witness against himself,' and that 'the accused shall * * * have the Assistance of Counsel'—rights which were put in jeopardy in that case through official overbearing. These precious rights were fixed in our Constitution only after centuries of persecution and struggle. And in the words of Chief Justice Marshall, they were secured 'for ages to come, and * * * designed to approach immortality as nearly as human institutions can approach it,' *Cohens v. Commonwealth of Virginia*, 6 Wheat. 264, 387, 5 L.Ed. 257 (1821)." (384 U.S. 443, 86 S.Ct. 1611)

Justice McClintock, writing for this court in *Dryden v. State*, Wyo., 535 P.2d

---

1. *Miskimins v. Shaver*, 8 Wyo. 392, 58 P. 411, 415 (1899); *Dickey v. State*, Wyo., 444 P.2d 373 (1968); *Priestley v. State*, Wyo., 446 P.2d 405 (1968); *Moss v. State*, Wyo., 492 P.2d 1329 (1972); *Gabrielson v. State*, Wyo., 510 P.2d 534 (1973); and *Dryden v. State*, Wyo., 535 P.2d 483 (1975).

2. At page 478 of 384 U.S., at page 1630 of 86 S.Ct., the Court says in *Miranda*, supra: "To summarize, we hold that when an individual is taken into custody or otherwise deprived of his freedom by the authorities in any significant way and is subjected to questioning, the privilege against self-incrimination is jeopardized. Procedural safeguards must be employed to protect the privilege and unless other fully effective means are adopted to notify the person of his right of silence and to assure that the exercise of the right will be scrupulously honored, the following measures are required. He must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires. Opportunity to exercise these rights must be afforded to him throughout the interrogation. After such warnings have been given, and such opportunity afforded him, the individual may knowingly and intelligently waive these rights and agree to answer questions and make a statement. But unless and until such warnings and waiver are demonstrated by the prosecution at trial, no evidence obtained as a result of interrogation can be used against him."

3. Maybe it is because we have all watched too much television and have come to suspect those seemingly nefarious witnesses who won't answer the nice senator's questions and instead "take the Fifth."

483, 490, when considering the privilege against self-incrimination, said:

"Section 11, Art. 1 of the Wyoming Constitution is specific that 'No person shall be compelled to testify against himself in any criminal case * * *.' In *Miskimins v. State*, 8 Wyo. 392, 58 P. 411, 415 (1899) this Court, citing Brown on Jurisdiction, Sec. 97, quoted with approval the statement that

" ' "* * * error of a court in construing any constitutional immunity or right in a criminal case against the accused is as fatal to the judgment as assuming jurisdiction originally where the court had none. Error in either case destroys the power to render any valid judgment, and, if rendered, it is, not simply erroneous, but void." '

"It is further pointed out, 58 P. at 420–421, that the 'constitutional privilege [against self-incrimination] is that the evidence shall not be extorted'; the privilege is that 'he shall not be compelled to testify'; the privilege is 'imbedded in the constitution, and embodies the wisdom of some centuries of experience upon the subject'; and the immunity is complete unless 'waived by the witness with knowledge of his rights.' This

" '* * * is an ancient principle of the law of evidence that a witness shall not be compelled, in any proceeding, to make disclosures or to give testimony which will tend to criminate him, or subject him to fines, penalties, or forfeitures.'

citing *Counselman v. Hitchcock*, 142 U. S. 547, 12 S.Ct. 195, 35 L.Ed. 1110. Violation of the constitutional right results in a void, not merely erroneous, judgment."

The right to refuse to testify against oneself, in a criminal proceeding, as this privilege is inscribed in our Federal Constitution [4], our State Constitution [5], and § 7–244, W.S.1957, 1975 Cum.Supp.[6], is the personification of the remedy for an evil which had its beginnings in inquisitional behavior and did some of its dirtiest work in the ecclesiastical courts of early England.[7] The protection was and still is imperative because it would appear that the inquisitions are not a thing of the past if the police manual directives for eliciting confessions, as reviewed in *Miranda*, are

---

4. Amendment V, Constitution of the United States:
   "No person shall be . . . compelled in any criminal case to be a witness against himself, . . ."

5. Article I, Section 11, Wyoming Constitution:
   "No person shall be compelled to testify against himself in any criminal case, . . ."

6. "§ 7–244. *Testimony of defendant.*—The defendant in all criminal cases, in all the courts of this state, may be sworn and examined as a witness, if he so elect, but shall not be required to testify in any case unless he has been lawfully granted immunity from prosecution, penalty or forfeiture and the neglect or refusal to testify without such immunity having been granted shall not create any presumption against him, nor shall any reference be made to, nor shall any comment be made upon, such neglect or refusal to testify. (C.L.1876, ch. 14, §§ 128, 129; Laws 1877, p. 25, §§ 1, 2; R.S.1887, § 3288; R.S.1899, § 5346; C.S.1910, § 6210; C.S.1920, § 7507; Laws 1925, ch. 15, § 1; R.S.1931, § 33–801; C.S.1945, § 10–1201; Laws 1971, ch. 94, § 1.)"

7. In an article in the Minnesota Law Review, Vol. 34, at page 1, under date of December, 1949, E. M. Morgan says:
   "Both Wigmore [fn] and Mary Hume Maguire [fn] find the roots of the privilege against self-incrimination in the resistance of Englishmen to the so-called oath *ex officio* of the ecclesiastical courts . . . The offensive characteristic of the procedure of which the oath was a part was its requirement that a person who had not been charged by a formal presentment or accusation answer under oath all questions put to him by the proper ecclesiastical official. The purpose of the inquiry was to discover suspected violations of church law or custom, or to establish the truth of either vague or definite charges not disclosed to the person questioned. The earlier form of the oath was introduced in the ecclesiastical courts of England in 1236, . . ." [Footnotes omitted]

an accurate reflection of what has been going on.[8]

It is because of these ancient tendencies by which men in possession of the powers of government seek, with the weaponry of government, to impose their will upon those whom they govern (or "serve") that the protections embodied in the Federal Fifth Amendment and the Wyoming Constitution, Article 1, Section 11, were needed.

The evil is so often spawned in the name of the law and the pursuit of the public order as expressed by officials who are engaged in doing what is "good," "right," "fair," "in the public interest," or who are so often "just doing their duty."[9] However, when public officials adopt their own ideas about morality as standards for adjudicating the righteousness of others—absent the guidelines furnished by the common and statutory law pool of experience contributed to by all civilized people—the "good," the "right," and the "fair" become the *expedient.*[10] The standard for the successful society is then judged according to the end result with precious little attention being paid to the manner by which it is achieved and to how many heads may have fallen into the basket in the process. Government becomes ultra powerful and the citizen is relegated to the least rather than the most important unit of the social order. The fragile cobwebs of human rights become misty visions which tend to blend with the ghosts of some public official's private opinion of what is "good," "fair," "right," and "just" until they become imperceptible and—at last—are no rights at all.

8. The interrogation techniques against which the Fifth Amendment cases of *Escobedo* and *Miranda* are set are summarized in *Miranda* (384 U.S. at page 455, 86 S.Ct. at page 1617), where the Court says:

"From these representative samples of interrogation techniques, the setting prescribed by the manuals and observed in practice becomes clear (referring to police manuals). In essence, it is this: To be alone with the subject is essential to prevent distraction and to deprive him of any outside support. The aura of confidence in his guilt undermines his will to resist. He merely confirms the preconceived story the police seek to have him describe. Patience and persistence, at times relentless questioning, are employed. To obtain a confession, the the interrogator must 'patiently maneuver himself or his quarry into a position from which the desired objective may be attained.' When normal procedures fail to produce the needed result, the police may resort to deceptive stratagems such as giving false legal advice. It is important to keep the subject off balance, for example, by trading on his insecurity about himself or his surroundings. The police then persuade, trick, or cajole him out of exercising his constitutional rights." [Parenthetical matter supplied]

9. In the 1897 issue of the Harvard Law Review there appears an article, "The Judicial Use of Torture," in which the author, A. Lawrence Lowell, at page 220, says:

"To a person with a philosophic turn of mind the interest in history consists not so much in what men have done in the past as in the reasons why they have done it. This is especially true of the use of torture, in itself the most revolting chapter in history, but one which has a peculiar moral value as showing the terrible results that may come from erroneous legal theories; for, *strange as it may seem, the habitual resort to torture in trials has been mainly due, not to a thirst for vengeance or to wanton cruelty, but to highly artificial principles of law devised without a consciously cruel intent. The practice has, in fact, been far less common in barbarous ages than in periods of civilization and refinement."* [Italics supplied]

10. In "The Judicial Use of Torture," supra at page 224, Lowell, in alluding to the Roman inquisitorial practices which were later adopted in Europe, speaks of an incident relating to the reason for judicial torture in India where

". . . Sir James Stephen tells us that during the preparation of the Indian Code of Criminal Procedure in 1872 some discussion took place about the reasons which occasionally led native police officers to torture prisoners, when an experienced civil officer observed, *'There is a great deal of laziness to it. It is far pleasanter to sit comfortably in the shade rubbing red pepper into a poor devil's eyes than to go about in the sun hunting up evidence.'"* [Italics supplied]

These are the forces with which the law is concerned when it contemplates the privilege against self-incrimination.

In *Miranda* the historical background of the ills giving rise to the embodiment of the privilege in our constitutional documents was recognized when the Chief Justice recounted the criminal trial of one John Lilburn who resisted the taking of an oath which would have bound him to answer all questions posed to him in 1638 England. He disclaimed the proceedings, stating

" 'Another fundamental right I then contended for was, that no man's conscience ought to be racked by oaths imposed, to answer to questions concerning himself in matters criminal, or pretended to be so.' Haller & Davies, The Leveller Tracts 1647–1653, p. 454 (1944)." (86 S.Ct. 1619)

The *Miranda* opinion observes (86 S.Ct. 1619) that

"On account of the Lilburn Trial, Parliament abolished the inquisitorial Court of Star Chamber and went further in giving him generous reparation . . ."

The Chief Justice, writing for the Court, says that these high principles emerging from the Lilburn Trial

". . . worked their way over to the Colonies and were implanted after great struggle into the Bill of Rights. Those who framed our Constitution and the Bill of Rights were ever aware of subtle encroachments on individual liberty. They knew that 'illegitimate and unconstitutional practices got their first footing * * * by silent approaches and slight deviations from legal modes of procedure.' *Boyd v. United States,* 116 U.S. 616, 635, 6 S.Ct. 524, 535, 29 L.Ed. 746 (1886). The privilege was elevated to constitutional status and has always been 'as broad as the mischief against which it seeks to guard.' *Counselman v. Hitchcock,* 142 U.S. 547, 562, 12 S.Ct. 195, 198, 35 L.Ed. 1110 (1892). We can-

not depart from this noble heritage." (86 S.Ct. 1620)

### The Case Itself

We turn, then, to the precise issue raised by Jerskey's appeal and ask:

Were his constitutional rights violated as those rights are guaranteed by the Fifth Amendment to the Federal Constitution and the corollary Article 1, Section 11, of the Wyoming Constitution?

The original package mailed to the defendant contained seven kilos of marihuana. It had been intercepted by the police whereupon six kilos were removed so that when it was delivered to the Bus Depot in Laramie, where he picked it up, only one kilo remained. In the course of the trial an officer was asked about conversations with the defendant when the defendant was undergoing custodial interrogation. The question and answer appear as follows:

"Q. Did you ask him anything else concerning that package?

"A. Yes, sir. We asked something to the effect of if he had expected more or if he had noticed anything missing and his reply to this was *no comment.*" [Emphasis supplied]

The defense counsel asked to be permitted to retire to Chambers where he objected as follows:

". . . Also I would object to and request that it be stricken, the comment about no comment at the very tail end of Sgt. Overman's testimony insofar as that constitutes a comment on the reliance of the accused on his rights and there are all kinds of cases that indicate that is improper.

"THE COURT: Overruled."

Officer Roylance testified:

"Detective Valdez asked if he wasn't selling it that was an awful lot to smoke, and he had *no comment.*" [Emphasis supplied]

Officer Vincent Valdez was on the stand and was asked if he had any conversations with the defendant on the way to the police station, and his answer was, in part:

". . . I asked him, 'You weren't planning to smoke it all by yourself?' I said, 'You would have to be a pretty heavy smoker to do that,' *And he offered no reply to this question.*" [Emphasis supplied]

In *Miranda,* the Supreme Court said the defendant may *waive* effectuation of the rights guaranteed to him by the Fifth Amendment,

". . . provided the waiver is made voluntarily, knowingly and intelligently. If, however, he indicates in any manner and at any stage of the process that he wishes to consult with an attorney before speaking there can be no questioning. *Likewise, if the individual is alone and indicates in any manner that he does not wish to be interrogated, the police may not question him. The mere fact that he may have answered some questions or volunteered some statements on his own does not deprive him of the right to refrain from answering any further inquiries until he has consulted with an attorney and thereafter consents to be questioned.*" [Italics supplied] (86 S.Ct. 1612)

*Miranda* goes on to say:

". . . Moreover, *where in-custody interrogation is involved, there is no room for the contention that the privilege is waived* (the right to remain silent) *if the individual answers some questions or gives some information on his own prior to invoking his right to remain silent when interrogated.*" [Italics and parenthetical matter supplied] (86 S.Ct. 1628)

The defendant Jerskey undertook the very course of conduct considered by the Court in *Miranda*—he conversed with the officers and then he refused to answer their questions. But the state says that Jerskey's privilege of silence was never invoked because his cooperation with the police caused it to be waived.[11] For this behavior, contends the State, the officers on the witness stand were free to tell the jury that, during their custodial interrogation, the defendant would not answer their questions which were aimed at his heart.

We do not agree.

██ It is not the intent—purpose—sense or letter of the privilege against self-incrimination generally or the *Miranda* decision specifically to say that the defendant's invocation of the privilege will result in a penalty being charged against his defense consisting of informing the jury that he has refused to talk with the officers during custodial interrogation. This is so unless the defendant has clearly and knowingly and with unmistakable understanding waived the privilege and has indicated that he knew that this was what he was doing and did it of his own free will. This is not shown in this case. The burden of proof of voluntariness and waiver is on the state.[12]

---

11. The State says in its brief:
"It is the position of the Appellee that when the statements alleged by the Appellant to be prejudicial, are placed in their proper context, they show that the Appellant was cooperative with the police, both before and after the statements in question. In view of the admissions made by the Appellant during these conversations, the Appellee would contend that the Appellant did not invoke his right to silence by his nonresponsiveness, but rather he waived his right to silence by cooperation with the police."

12. In *Miranda,* supra, the Court observes that if interrogation continues without an attorney

"a heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination" and that the Court has always set high standards of proof for waiver of constitutional rights.
The Court says:

". . . Since the State is responsible for establishing the isolated circumstances under which the interrogation takes place and has the only means of making available corroborated evidence of warnings given during incommunicado interrogation, the burden is rightly on its shoulders." (384 U.S. at 475, 86 S.Ct. at 1628)

There is no testimony in the record indicating that the defendant knew or was in any way informed that if he cooperated with the police, he would thereby burden his right to remain silent through the payment of the penalty of having the fact of his silence made known to the jury.· The State did not prove that Jerskey knowingly waived his privilege and therefore he did not, for purposes of these considerations, waive his privilege.

### Is Silence Damning Under Miranda?

It is said in *Miranda:*

". . . More important, such a warning (that he has the right to remain silent) is an absolute prerequisite in overcoming the inherent pressures of the interrogation atmosphere. It is not just the subnormal or woefully ignorant who succumb to an interrogator's imprecations, whether implied or expressly stated, that the interrogation will continue until a confession is obtained *or that silence in the face of accusation is itself damning and will bode ill when presented to a jury . . .*" [Parenthetical matter and emphasis supplied] (86 S.Ct. 1624)

In note 37 of *Miranda,* 384 U.S. 468–469, 86 S.Ct. 1624–1625, the Court says:

". . . In accord with our decision today, it is impermissible to penalize an individual for exercising his Fifth Amendment privilege when he is under police custodial interrogation. *The prosecution may not, therefore, use at trial the fact that he stood mute or claimed his privilege in face of accusation.* · Cf. *Griffin v. State of California,* 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965); *Malloy v. Hogan,* 378 U.S. 1, 8, 84 S.Ct. 1489, 1493, 12 L.Ed.2d 653 (1964); Comment, 31 U.Chi.L.Rev. 556 (1964); Developments in the Law—Confessions, 79 Harv.L.Rev. 935, 1041–1044 (1966). See also *Bram v. United States,* 168 U.S. 532, 562, 18 S.Ct. 183, 194, 42 L.Ed. 568 (1897)." [Emphasis supplied]

In *Griffin v. California,* supra, the defendant was on trial for murder and did not testify. The California law contained a constitutional admonition and statute whereby it was authorized that in any criminal case, whether the defendant testifies or not, his failure to explain or deny by his testimony any evidence or facts in the case against him could be commented upon by the court and by counsel and considered by the court or the jury.

The court instructed the jury that the defendant has a constitutional right not to testify, but that if he doesn't the jury may take that fact into consideration for various purposes. The prosecuting attorney, in his argument, urged that only the defendant knew the answer to some of the unanswered questions and that the jury would have access to the entire factual situation if only he had testified.

The United States Supreme Court (85 S.Ct. 1232) said:

". . . The question remains (notwithstanding the California constitution) whether, statute or not, the comment rule, approved by California, vio-

The *Miranda* opinion goes on to hold:
". . . But a valid waiver will not be presumed simply from the silence of the accused after warnings are given or simply from the fact that a confession was in fact eventually obtained. A statement we made in *Carnley v. Cochran,* 369 U.S. 506, 516, 82 S.Ct. 884, 890, 8 L.Ed.2d 70 (1962), is applicable here: '*Presuming waiver from a silent record is impermissible.*'" [Emphasis supplied]
We said in *Maki v. State,* 18 Wyo. 481, 485–486, 112 P. 334, 335 (1911).

". . . It is the general rule that self-criminating statements are not per se admissible over objection, when the evidence discloses that the defendant was in custody for the crime charged at the time of making such statements, unless shown to have been voluntarily made. Under this rule, there is no presumption that such statements are voluntarily made, but, on the contrary, the presumption is the other way, *and upon the trial of an accused the burden· is upon the state, seeking to prove such statements, to show their voluntary character . . .*" [Emphasis supplied]

lates the Fifth Amendment. We think it does . . ."

The Court continued:

". . . [C]omment on the refusal to testify is a remnant of the 'inquisitorial system of criminal justice.' *Murphy v. Waterfront Comm.*, 378 U.S. 52, 55, 84 S.Ct. 1594, 1596, 12 L.Ed.2d 678, which the Fifth Amendment outlaws. It is a penalty imposed by courts for exercising a constitutional privilege. It cuts down on the privilege by making its assertion costly."

And further (85 S.Ct. 1233):

". . . We . . . hold that the Fifth Amendment, in its direct application to the Federal Government and in its bearing on the States by reason of the Fourteenth Amendment, *forbids either comment by the prosecution on the accused's silence or instructions by the court that such silence is evidence of guilt*." [Emphasis supplied]

In *Gabrielson v. State,* Wyo., 510 P.2d 534, now Chief Justice Guthrie, concurring, considered this same general proposition and referred to *Miranda v. State of Arizona* and particularly to Footnote 37, supra. Justice Guthrie called attention to *State v. Ritson,* 210 Kan. 760, 504 P.2d 605, 611, and cited therefrom.

The *Ritson* case was one in which the detective asked the defendant some questions such as:

" '. . . I asked him if they all three stayed at the auction and he said that they did. I asked him if at any time did Mr. White and Robinson (the alleged accomplices) leave the auction without him and he said no. I said at any time did they leave your sight or the vicinity you were in at the auction and he said definitely not. He said they all three stayed in the auction up until a little after 9:00 where they went straight back to Valley Center. I then approached him in the manner—or I told him that I had seen them in Wichita at 29th and Amidon *and he had no answer.* I said if I told you

that I had seen you, and . . . gave him the time that I seen him at 8:40 p. m., I said, are you saying this would be incorrect? *And he had no answer. He wouldn't say anything. As a matter of fact, this is when I stopped talking to him. He asked for an attorney.' "*

[Parenthetical matter supplied]

Justice Guthrie quoted in *Gabrielson* the following from Ritson:

" 'There can be no doubt that the interjection of this evidence was error. Its sole purpose was to show that when defendant was confronted with evidence contradicting his alibi he had refused to talk and demanded counsel. It was clearly a use of defendant's invocation of his constitutional rights to silence and to counsel as substantive evidence of guilt—otherwise it had no probative value as rebuttal of defendant's story. Such a use is not permissible under *Miranda v. Arizona,* 384 U.S. 436, f.n. 437 [sic], 86 S.Ct. 1602, 16 L.Ed.2d 694, 10 A.L.R.3d 974; and our own holding in *State v. Bowman,* 204 Kan. 234, 461 P.2d 735; and *State v. Dearman,* 198 Kan. 44, 422 P.2d 573, Cf. *Griffin v. California,* 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106; *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705.' " [We have included the citations that were omitted in *Gabrielson*]

The writer of the *Ritson* opinion went on to say:

" 'The only question here is whether it is harmless error. The error being of constitutional character, it is not harmless if *"there is a reasonable possibility that the evidence complained of might have contributed to the conviction." Fahy v. Connecticut,* 375 U.S. 85, 86–87, 84 S.Ct. 229, 230, 11 L.Ed.2d 171. Put another way, to be harmless *it must be "harmless beyond a reasonable doubt." Chapman v. California, supra,* 386 U.S. at 24, 87 S.Ct. 824 . . .' " [We have included a citation omitted from *Gabrielson,* from whence this is quoted.] [Emphasis supplied]

We held in *Gabrielson*, supra, through the concurring opinion of Justice Guthrie, that it was in violation of the Fifth Amendment to the United States Constitution and Article 1, Section 11, of the Wyoming Constitution, for an officer to comment on the accused's silence where the officer testified before the jury:

" 'After I read or recited the Miranda warning to him, he refused to say anything to me.' "—

or where, in cross-examination, the county attorney asked the following question to which the following answer was given:

" 'When questioned by the Sheriff's Office on June 26, 1972, concerning this matter, you refused to make a statement, did you not?

" 'A.  I did.' "

### What is Harmless Error?

As we have seen, under the *Chapman v. California* standard, comment upon the defendant's failure to testify at trial can be held to be nonprejudicial only where it can be shown beyond reasonable doubt to have been harmless and not to have contributed to a conviction.  The Colorado Supreme Court has determined that error is prejudicial if a prosecutor's comments upon a defendant's silence are calculated or intended to direct the attention of the jury to the defendant's exercise of his right not to testify.  *Martinez v. People*, 162 Colo. 195, 425 P.2d 299 (1967).  Although such statements are not violative of the rule if intended only as a general comment on the fact that the state's evidence was uncontradicted, they constitute reversible error where the prosecution has used the defendant's silence as a means of creating an inference of guilt.  *Hines v. People*, Colo., 497 P.2d 1258 (1972).  Other courts have similarly held that reversible error is committed by comment which directs the jury's attention to the fact that the defendant did not take the wtness stand. *People v. Alexander*, 17 Mich.App. 497, 169 N.W.2d 652 (1969); *State v. Dent*, 51 N.J. 428, 241 A. 2d 833 (1968).

### Recent Authority

Late cases throughout the country are supportive of our position here: See *State v. Benfield*, Mo.App., 522 S.W.2d 830, 834, (1975), where the judgment was reversed and the cause remanded when comment was made that a prisoner refused to respond to questions, and the court said:

"In *State v. Stuart*, 456 S.W.2d 19 (Mo. banc 1970), the following language appears at page 22:

" 'The law is established in this state that the silence of an accused while under arrest is not admissible against him because he is under no duty to speak . . . *We now hold that an accused's failure to volunteer an exculpatory statement is not admissible as an admission; that it may not be shown that by his silence he failed to deny or explain while under arrest an incriminating fact as to which no question was asked.* See: 22A C.J.S. Criminal Law § 734(1) a, p. 1072. The admission of such evidence constitutes an invasion of an accused's constitutional rights. *State v. Battles*, supra, 357 Mo. 1223, 212 S.W.2d 753 at 757[9].' "

It was said in *People v. Watson*, 28 Ill. App.3d 786, 329 N.E.2d 512, at page 515 (1975), a case where the state elicited testimony upon the defendant's silence:

". . . We agree that the State does not have the right to elicit comments upon this defendant's silence.  The admission of this evidence was improper and should not have been permitted." (This was not held to be prejudicial and thus reversible because it was non-jury).

In *People v. Hellemeyer*, 28 Ill.App.3d 491, 328 N.E.2d 626 (1975), where defendants had exercised their rights to remain silent by refusing to respond to questions and sign statements, the court held:

"It is error to permit the prosecutor to prove, over defendant's objection, that the defendant had refused to make a

statement to the police." (Citing cases) and

quoting from *Miranda*—the case was reversed.

In *United States v. Hale,* 422 U.S. 171, 95 S.Ct. 2133, 45 L.Ed.2d 99, argued April 14, 1975, decided June 23, 1975, the same question was involved, and the United States Supreme Court, in supporting the Miranda decision, made some observations with respect to silence at the time of arrest where it said:

"Not only is evidence of silence at the time of arrest generally not very probative of a defendant's credibility, but it also has a significant potential for prejudice. The danger is that the jury is likely to assign much more weight to the defendant's previous silence than is warranted. And permitting the defendant to explain the reasons for his silence is unlikely to overcome the strong negative inference that the jury is likely to draw from the fact that the defendant remained silent at the time of his arrest."

The Court said:

". . . We now conclude that the respondent's silence during police interrogation lacked significant probative value and that any reference to his silence under such circumstances carried with it an intolerably prejudicial impact.

"Accordingly, we hold that under the circumstances of this case it was prejudicial error for the trial court to permit cross-examination of respondent concerning his silence during police interrogation, and we conclude, in the exercise of our supervisory authority over the lower federal courts, that Hale is entitled to a new trial."

■ When we apply these principles to the state's witnesses' testimony to the effect that the appellant had refused to respond when asked if he planned to sell the marihuana, it seems clear and we hold that reversible error was committed. The prosecution elicited the testimony that defendant had remained silent during custodial interrogation, not to show that its own evidence stood uncontradicted, but to create the inference that an honest answer would have established the appellant's guilt. This was impermissible and violated the defendant's privilege against self-incrimination.

## II

### DOUBLE JEOPARDY

#### *Statement of Facts*

On May 10, 1974, the Laramie Police Department received a call from the Phoenix, Arizona Police Department, advising that a package containing seven bricks of marihuana had been intercepted at a bus depot in Phoenix, with a Laramie, Wyoming address as the destination, and that they were sending the package on with one brick remaining in the package. Six of the seven bricks were in fact confiscated by the police while the other was marked for identification and placed back in the wrapping, which was resealed and sent to its destination. The address on the package was: P. Jerskey, 657 North 13th, Laramie, Wyoming.

The parcel arrived in Laramie May 13, 1974, and the police were contacted, whereupon they went to the depot and inspected and photographed the package. They did not open it and instructed the clerk at Greyhound not to deliver it to the addressee until he was told to do so.

Prior to its arrival a man identified as the appellant had left a telephone number for the bus depot clerk to call when the package came and, when the police had formulated a plan for surveillance, they instructed the Greyhound Bus Depot clerk to call the number left by the appellant—ask for Mr. Jerskey and to inform him that it had arrived. The appellant was so advised and when he came to collect his parcel the police observed and photographed the transaction and followed him to 657 North 13th.

The officers obtained a search warrant —searched the premises and found the

package to have been opened—the contents were missing. When the police arrived the appellant was not in the house but he soon returned, whereupon he was searched and the bus billing was found in his back pants' pocket. Mr. Jerskey was given some advice of his rights, whereupon he admitted that he had picked up the package at the bus depot—identified the package as the one he had picked up, and admitted opening it. He told the officers that he had removed the contents and put them in the refrigerator where the brick of marihuana was found.

Based upon the above facts the defendant was charged with *possession* of a controlled substance with intent to deliver and *attempted possession* of a controlled substance with intent to deliver, in violation of and contrary to §§ 35–347.31(a)(ii) and 35–347.42 W.S.1957, 1975 Cum.Supp.

The issue of double jeopardy[13] in the context presented to us here has been discussed in numerous other cases.[14]

Appellant's assignment of error, as described in his appeal brief, is as follows:

"A. Appellant was denied a fair and impartial trial in that he was tried on two separate indictments, which arose out of the same circumstances, and which constituted one offense, to his prejudice; and the conviction on both indictments was contrary to law and constituted double jeopardy."

The pertinent sections of the statute under which the defendant was charged, tried and convicted are:

". . . [I]t is unlawful for any person to . . . possess with intent to . . . deliver, a controlled substance." § 35–347.31(a)(ii), W.S.1957, 1975 Cum. Supp.

"Any person who attempts or conspires to commit any offense under this article within the State of Wyoming or who conspires to commit an act beyond the State of Wyoming which if done in this state would be an offense punishable under this article, shall - be punished . . ." § 35–347.42, W.S.1957, 1975 Cum.Supp.

■ The Wyoming Rules of Criminal Procedure govern, and § 7–131, W.S.1957, requiring the prosecutor to elect when there are pending against the defendant two or more indictments for the same criminal act, is, contrary to the contention of appellant, superseded by Rules 11 and 12 of the Wyoming Rules of Criminal Procedure. When the defendant's conduct violates more than one criminal statute, it is the prosecutor who decides how many offenses to charge. *Ashe v. Swenson,* 397 U.S. 436, 452, 90 S.Ct. 1189, 1198, 25 L. Ed.2d 469; 1961 Wisconsin Law Review, 528; 75 Yale Law Journal, 262, 304.

We held in *Dycus v. State,* supra:

". . . Rules 11 and 12 specifically permit joinder of offenses and trial together of two or more indictments. As is stated in *Pointer v. United States,* 151 U.S. 396, 403, 14 S.Ct. 410, 38 L.Ed. 208, . . . the settled rule is that the matter is one for the court's discretion, and here, as in Pointer, there was a close connection between the two crimes charged in respect to time, place, and occasion . . ."

The applicable Rules of Criminal Procedure are:

"Rule 11. Joinder of Offenses and of Defendants.

"(a) *Joinder of Offenses.* Two or more offenses may be charged in the

---

13. Amendment V, Constitution of the United States:

". . . nor shall any person be subject for the same offense to be twice put in jeopardy of life or limb; . . ."

To the same effect: The Wyoming Constitution, Article 1, Section 11.

14. *State v. Tobin,* 31 Wyo. 355, 226 P. 681 (1924); *Dobbins v. State,* Wyo., 483 P.2d 255 (1971); *Loddy v. State,* Wyo., 502 P.2d 194 (1972); *Dorador v. State,* Wyo., 520 P.

same indictment or information in a separate count for each offense if the offenses charged, whether felonies or misdemeanors or both, are of the same or similar character or are based on the same act or transaction, or on two or more acts or transactions connected together or constituting part of a common scheme or plan."

"Rule 12. Trial Together of Indictments or Informations.

"The court may order two or more indictments or informations or both to be tried together if the offenses, and the defendants, if there is more than one, could have been joined in a single indictment or information. The procedure shall be the same as if the prosecution were under such single indictment or information."

■■ Under the facts of this case it was proper for the indictment to contain more than one count charging the commission of more than one crime. It was also proper that both alleged violations be tried in one proceeding because they were of similar character and based on the same act or transaction or, at the very least, on "two or more acts or transactions connected together or constituting part of a common scheme or plan." (Rule 11(a), W.R.Cr.P.) See *Dobbins v. State*, Wyo., 483 P.2d 255; *Boyd v. State*, Wyo., 528 P.2d 287; *Dycus v. State*, Wyo., 529 P.2d 979; and *Dorador v. State*, Wyo., 520 P.2d 230.

The question remaining for resolution is whether or not the court should have per-

mitted the case to go to the jury on both charges, thus submitting the defendant to the possibility of two convictions when the evidence indicated that there was but one mailing to and one receiving by the defendant and that part of the contents of the original package of seven kilos of marihuana was the same controlled substance which was the subject of both charges, namely,

"possession with intent to deliver"

and

"attempted possession with intent to deliver." [15]

At the outset, we observe here that we are in an area which properly calls into play the double jeopardy question.

In the Article, "Twice in Jeopardy," Vol. 75, Yale Law Journal, the author says, at page 265:

"Three rules are central to the double jeopardy prohibition: the rules which bar retrial for the same offense after acquittal, retrial for the same offense after conviction, and *multiple punishment for the same offense at one trial* . . ." [Emphasis supplied]

In *ex parte Lange,* 85 U.S. (18 Wall.) 163, 173, 21 L.Ed. 872 (1873), the United States Supreme Court said:

". . . [T]he Constitution was designed as much to prevent the criminal from being twice punished for the same offence as from being twice tried . . ." (Approved in *United States v. Benz,* 282 U.S. 304, 307–309, 51 S.Ct. 113, 75 L.Ed. 354 (1931).)

---

2d 230 (1974); *Jackson v. State*, Wyo., 522 P.2d 1356 (1974); *Boyd v. State*, Wyo., 528 P.2d 287 (1974); *Dycus v. State*, Wyo., 529 P.2d 979 (1974); and *Jackson v. State*, Wyo., 533 P.2d 1 (1975).

15. We said in *Dycus v. State*, Wyo., 529 P.2d 979, at page 980:
". . . Even so, the court should not have permitted the case to go to the jury on both counts when the evidence, without contradiction, indicated that the same controlled substance was both possessed and delivered by the defendant . . ."

Dycus has been relied upon in this context of the rule in a later opinion of this court. See *Jackson v. State*, Wyo., 533 P.2d 1. We also said in *Dorador v. State*, Wyo., 520 P.2d 230, 231, where the charges were possession with intent to deliver and delivery of a controlled substance, that, under the merger philosophy of *Loddy v. State*,

". . . [W]e agree that a person who, in one transaction, possesses with intent to deliver and delivers a controlled substance commits a single violation of the statute and should incur only one punishment."

The question raised pertains to the last category above noted, namely,

"multiple punishment for the same offense at one trial."

The appellant-defendant says that he is being punished twice for the same offense since both indictments

"arose out of the same circumstances and constitute one offense . . .,"

and further that the lesser charge of "attempted possession with intent to deliver" had merged with the greater charge of "possession with intent to deliver," under the doctrine of *State v. Tobin*, 31 Wyo. 355, 367–368, 226 P. 681, 685 (1924) [16] and *Loddy v. State*, Wyo., 502 P.2d 194, 197 (1972).[17] The appellant therefore contends that conviction and sentence could have been had on but one of the charges under the merger holdings of *Tobin* and *Loddy*.

The State, on the other hand, says that

"The offenses grew out of two different transactions,"

and therefore the defendant can be charged, tried, *convicted* and *sentenced* on each.

In *Jackson v. State*, 522 P.2d 1356, 1359, Justice Parker set out the rule for determining the presence of double jeopardy when he said:

". . . The pertinent rule, although variously stated, is well phrased in *State*

*v. Johnson*, 112 Ohio App. 124, 165 N.E. 2d 814, 820:

"' * * * if the offenses charged are separate and distinct either with respect to statutory definition, or, because * * * *they grow out of different transactions* and different evidence· is needed to prove each, then the constitutional inhibition against double jeopardy is not applicable and, so long as the offenses charged are not factually inconsistent, a defendant· may be found guilty and judgment of sentence thereon may be had as to each of the offenses charged. * * *';" [Emphasis supplied] [18]

Then Justice Parker observed in *Jackson* that the two offenses there charged are

"separate and distinct with respect to statutory definition."

He then went on to say, however:

". . . Even so, as pointed out by this court in *State v. Tobin*, 31 Wyo. 355, 226 P. 681, 686, in certain situations the violation of a charged offense separate and distinct from another with respect to statutory definition is necessarily embraced in and merged in the other."

We have said that the two separate charges with which we are here concerned could be brought in the same complaint under the theory that both alleged offenses

"are of the same or similar character or are based on the same act or transaction,

---

16. Justice Blume, speaking for the court in *Tobin*, said, at 226 P. 685:

" 'The rule is well settled that, where a statute makes either of two or more distinct acts, connected with the same general offense and subject to the same measure and kind of punishment, indictable separately and as distinct crimes, when each shall have been committed by different persons or at different times, they may, when committed by the same person at the same time, be coupled in one count, as constituting altogether but one offense. *In such cases the several acts are considered as so many steps or stages in the same affair, and the offender may be indicted as for one combined act in violation of law; and proof of either of the acts mentioned*

in the statute and set forth in the indictment will sustain a conviction.' *Byrne v. State*, 12 Wis. 519;" [Italics ours]

17. We said in *Loddy v. State*, Wyo., 502 P. 2d 194, 197:

"The defendant cited *State v. Tobin*, 31 Wyo. 355, 226 P. 681, wherein the defendant was convicted of gambling and permitting gambling. We said the 'permitting' in such case was necessarily embraced in the act of 'conducting and carrying on' and was merged in the latter, and hence there should have been imposed upon the defendant only one sentence."

18. See also 22 C.J.S. Criminal Law § 295 (3), p. 772.

or on two or more acts or transactions connected together or constituting part of a common scheme or plan . . ."
Rule 11(a), W.R.Cr.P., supra,

and we have said they could be *tried* together under Rule 12 because they could have been *joined* under Rule 11. For us now to hold that the

"offenses grew out of two *different* transactions"

and were *not* connected together and did *not* constitute a common scheme or plan, in order to attempt to justify two convictions, would be just as incongruous for us as it is incongruous for the State to allege it and profess to believe it.

The State's "different transactions" argument made for purposes of supporting two separate convictions is untenable.

The "transaction"—the "common scheme or plan" consisted of one mailing of the controlled substance, presumably for the purpose of permitting Jerskey to receive it in order that he could sell marihuana.[19] The fact that six bricks were confiscated by the police en route and thus only one was received cannot, in our judgment, make up such "different transactions" or change the "common scheme or plan" in a way which will support two convictions.

There was one intent which was the gravamen of the crime[20], namely, *"possession with intent to deliver a controlled substance"* and the evidence which would have been required to prove that count would, generally speaking, be relevant and material, and in most instances necessary, to the proof of the second charge, which was *"attempted possession with intent to deliver a controlled substance."* Indeed the facts here cannot withstand the test of *Jackson v. State*, Wyo., 522 P.2d 1356, supra, in a

manner which would indicate there is no double jeopardy.

Even though, for reasons given herein, both counts could be brought under the same complaint—both counts could be tried at the same time—the same witnesses could testify in the proof of each charge insofar as their testimony was relevant, material and competent, or otherwise admissible, and the same evidence could be received to support each count, the defendant could not, however, be convicted and sentenced to prison for more than one offense.

There was but one transaction—one common scheme or plan—and, because one offense was merged with another, the convictions may not be stacked because the result would be to have twice placed the defendant in jeopardy in that he would have received multiple punishment for the same offense at one trial.

It was therefore prejudicial error for the court to enter judgment and sentence for more than one of the alleged crimes.

## III

## INVASION OF PROVINCE OF THE JURY

The last assignment of error that the appellant makes is as follows:

"C. The court erred in commenting on the evidence to the jury and violated the appellant's constitutional rights, thus requiring reversal."

We will consider this contention only briefly since the case must be returned for a new trial on other grounds. This assignment concerns itself with a trial error, and there is no reason to believe that this same circumstance would arise again at the retrial of Mr. Jerskey.

19. We do not pre-judge any new trial in this case and make this statement only for the purpose of making the point at hand, namely, the formulating of the boundaries of the "transaction"—the "common scheme"—the "plan."

20. In *Dorador v. State*, supra, Justice McIntyre, speaking for the court in considering

whether there could be two convictions and two sentences for the separate offenses of possession with intent to deliver and delivery of a controlled substance, held that there could not since both offenses arose

"from the same transaction inspired by the same criminal intent which is the essential element of each offense, . . ."

The actual question for consideration is whether, in stating to the jury that possession of marihuana had been admitted by the defendant, the court thereby invaded the province of the jury.

Whether or not defendant had possession of the controlled substance was a question of fact. The jury could not have convicted on the first count of

"possession with intent to deliver"

if it could not have first been determined that Jerskey had possession. While there had been some conversation between court and counsel about the defendant's possession of the drug, nowhere in the record did it appear that defense counsel had admitted possession up to and including the time when the court recalled the jury to attempt to clarify some questions that the members had about, among other things, possession.

At this juncture, the court made the statement to the jurors that the defendant's attorney had admitted his client "knowingly possessed marijuana"—"he (Jerskey) says that there is no question about the possession"—"the defendant has already admitted that he knew that he had marijuana . . .", etc.

We find no such admissions in the record as the court understood them to exist during this conversation with the jury. True—court and counsel had discussed a prior offer by the defendant to plead guilty to possession and counsel had requested an instruction which would state that fact. However, both the plea and the instruction had been refused and there was no record showing of any other purported admission by defendant or his counsel that defendant had admitted or had offered to admit possession. Certainly there is no testimonial admission of possession by any witness purporting to speak for the defendant. When the court had its conversation with the jury, the question of "possession" was a question of fact and was squarely before the jury for its consideration. It was, at this point, *an invasion of the province of the jury under the then state of the record for the court to have informed the jury that there was no question of possession— that the defense counsel had admitted possession.*

However, at the end of the discussion between the court and members of the jury on the subject of possession and other things, and, in open court, the court addressed defendant's counsel and asked:

". . . Is there anything that you would add, or any exception you would take to what the Court has said to the jury?",

to which the defense counsel answered:

"No, your Honor."

We believe that this last exchange was tantamount to a stipulation in the record by the defendant, through his counsel and with the court, that the defendant in fact admitted possession of the marihuana. Prior to that time, however, there was no such record admission.

Because of the stipulation just described, we hold that there was no court invasion of the province of the jury because counsel, in effect, agreed that the possession by the defendant of the marihuana was an admitted fact and no longer a question for the jury. We therefore find no error in the court's remarks to the jury with respect to the possession of the marihuana, but we observe parenthetically that this is sort of an unusual and perhaps frightening way to instruct the jury on one of the major factual elements of the crime. It amounted to a directed verdict on the lesser-included offense of possession, but, since the verdict was directed by the court with consent of defense counsel, there is no error and no prejudice to the defendant.

## HOLDING

In summary, we hold that there was no error committed by the court in its comments on the evidence before the jury and the province of the jury was not thereby invaded.

Prejudicial, and therefore reversible, error was committed in overruling the objec-

tion and motion to strike the testimony of witnesses who revealed to the jury that the defendant refused to answer the officers' questions during custodial interrogation, for the reason that this ruling resulted in the violation of the defendant's privilege against self-incrimination, which is guaranteed to him under the Federal and State Constitutions.

It was prejudicial, and therefore reversible, error to allow multiple convictions and to impose multiple sentences upon the defendant at one trial, for the reason that such convictions place the defendant twice in jeopardy for the same offense—all in violation of the rights guaranteed to him under the Federal and State Constitutions.

Reversed and remanded for new trial.

GUTHRIE, C. J., concurs in the result.

RAPER and THOMAS, JJ., did not participate.