**David PRIESTLEY, Appellant
(Defendant below),**

v.

**STATE of Wyoming, Appellee
(Plaintiff below).**

No. 3688.

Supreme Court of Wyoming.

Nov. 1, 1968.

David H. Carmichael, of Kline & Tilker, Cheyenne, for appellant.

James E. Barrett, Atty. Gen., Lynn R. Garrett, Deputy Atty. Gen., Cheyenne, for appellee.

Before HARNSBERGER, C. J., and GRAY, McINTYRE and PARKER, JJ.

Mr. Justice McINTYRE delivered the opinion of the court.

David Priestley was charged, tried and convicted of grand larceny. His appeal

raises (1) the question of whether the accused was afforded protection in compliance with the standards set up in Miranda v. State of Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694, 10 A.L.R.3d 974; and (2) whether the trial court should have independently determined the admissibility of a statement attributed to defendant.

A short time after Priestley had been in the City Cafe, in Cheyenne, the owner discovered approximately $400 was missing from the cafe. From a picture shown to him by the police, the owner identified Priestley as the man who had been in his cafe just prior to the time when the money was missed.

At that point, counsel for appellant claims, Priestley became a prime suspect and the police were ready to arrest him on sight. Soon a patrolman, who was one of the officers investigating the theft, saw a man resembling the suspect walking along a street in Cheyenne. The testimony of the patrolman concerning his first contact with this man, who was in fact Priestley, is important in determining whether defendant was coerced into a statement. We therefore set out in full the pertinent testimony of the patrolman on his meeting with defendant.

"Q. What did you do if anything? A. I made a U-turn and approached the subject by car and motioned for him to come over to the car and asked him for his name and he did not reply, and I asked him for his military identification.

"Q. Were you inside or outside your car at this time? A. I was inside.

"Q. Go ahead, what happened then? A. I asked him for military identification, and he produced a note book with his name in it, while I was looking at this, he opened up the police car door and asked me to take him to the City Cafe.

"Q. And did he tell his name prior to that? A. No, he never did tell me his name.

"Q. What else did he say? MR. CAR-MICHAEL: I will object to the question

as being incompetent, irrelevant and immaterial and further that a proper foundation has not been laid for this line of questioning. May we approach the bench, Your Honor. (WHEREUPON A DISCUSSION WAS HAD AT THE BENCH) THE COURT: The objection will be sustained.

"Q. Referring you, now, back to your previous testimony of being on the south side and seeing an individual and approaching the individual, who was the person that you approached, do you know? A. It was David Priestley.

"Q. And where did you see, where did you approach him? A. Near the intersection of 9th Street and Central.

"Q. Would that— A. He was just going up the viaduct, traveling north.

"Q. What did you do subsequently when you approached him? A. I motioned for the gentleman to come over to the police car. He was standing outside of the police car and I asked him what his name was and he did not reply, and I asked him for military identification card and he shrugged his shoulders and handed me a notebook.

"Q. Had Mr. Priestley said anything to you? A. No, he had not.

"Q. Then, what did you do? A. As I was looking at the notebook he opened up the police car and started getting in and asked me to take him to the City Cafe.

"Q. What occurred then? A. He asked me to take him to the City Cafe, he stated he had taken a large sum of money and at that time I placed him under arrest.

"Q. What else happened at that time?

MR. CARMICHAEL: Your Honor, I will object, again, I will object to these answers that was given as unresponsive and I would like to renew my prior objection again as to any improper foundation that hasn't been laid for this line of inquiring. THE COURT: Objection is overruled.

"Q. All right, what did you do then? A. I placed the subject under arrest, frisked him and advised him of his rights.

"Q. What did you do? A. I advised him that he had the right to remain silent, and anything that he did say could be used against him in Court and that he had the right to an attorney to represent him before being questioned and that if he could not afford an attorney one would be appointed for him and I asked him if he understood what I just had stated.

"Q. What if anything did the defendant do then? A. He stated, 'Take me up to the City Cafe'.

"Q. All right, what did you do then? A. Took the subject up to the City Cafe on 17th Street."

The only other testimony relating to the initial meeting between the patrolman and defendant was the testimony of Priestley himself. The pertinent part of his testimony was as follows:

"Q. What did you do after that? A. * * * I met a policeman and so he drove past me and then he pulled up beside me and he had my name on a piece of paper, so I told him, he asked me if I had any identification, and I told him I had lost my identification over in Denver, Colorado, I had lost my identification and he told me to get—to get into the car, so I got in and asked him what he wanted with me and he said, you know, taking this man's money at the City Cafe.

"Q. Did he say anything about that you had a right to remain silent? A. No, sir.

"Q. Did he tell you that anything you said might be held against you? A. No.

"Q. Did he tell you you had a right to a lawyer, and if you couldn't afford one, one would be appointed? A. No.

"Q. When was the first time that anyone told you that? A. The two detectives, the one that sat upon the stand, the little short one, when I got over there.

"Q. Over where? A. To the City Cafe, when the police officer drove me back over to the City Cafe."

### Custodial Interrogation

Regardless of whether the testimony of the patrolman or the testimony of the defendant is considered, there would be no basis for saying there was improper custodial interrogation at the time Priestley was picked up. No improper interrogation at a later time is claimed.

█ If we accept as true the testimony of the patrolman—which would be according to the general appellate rule—the story we get is that there was no interrogation at all. The patrolman merely asked for military identification. Then, while the patrolman was looking at the notebook handed him, Priestley opened up the car door and asked the officer to take him to the City Cafe, stating he had taken a large sum of money.

According to the officer's story, there were no further questions. Instead, the defendant was arrested, warned of his constitutional rights, and taken to the City Cafe.

█ The Supreme Court of the United States, in the *Miranda* decision, has expressly approved the admission of statements such as the one which the patrolman attributed to Priestley. At 86 S.Ct. 1630, 16 L.Ed.2d 694, the court stated:

"In dealing with statements obtained through interrogation, we do not purport to find all confessions inadmissible. Confessions remain a proper element in law enforcement. Any statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence. The fundamental import of the privilege while an individual is in custody is not whether he is allowed to talk to the police without the benefit of warnings and counsel, but whether he can be interrogated. There is no requirement that police stop a person who enters a police station and states that he wishes to confess to a crime, or a person who calls the police to offer a confession or any

other statement he desires to make. Volunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by our holding today."

■ If we accept the officer's version of what transpired, Priestley's statement was clearly a volunteered statement of the kind referred to in the foregoing quotation. Thus, as stated in the *Miranda* opinion, such a statement is not barred by the Fifth Amendment and its admissibility is not affected by the holding in that case.

■ Even if we were to accept Priestley's version of what transpired when he was picked up, we arrive at the same result. According to his story, the officer merely asked for identification. It was afterwards when, according to Priestley, the officer told defendant to get into the car. There of course could be no custody until Priestley did get in. From that point on the only question asked was by Priestley. He asked the officer what the officer wanted with him. It was the officer and not Priestley who made the statement, the officer saying, "You know, taking this man's money at the City Cafe."

Priestley admits he was warned of his constitutional rights when he got to the City Cafe. He did not testify to any interrogation following his entrance into the patrolman's car until after he had been properly warned of his rights at the City Cafe. We do not understand that defendant even now is claiming any such interrogation took place.

With a total absence of anything in the record to indicate a custodial interrogation by the patrolman, prior to the arrival at City Cafe, we fail to see any basis for counsel's claim that the accused was not afforded protection in compliance with the standards set up in Miranda v. State of Arizona, supra.

■ What was said in Duffy v. State, 243 Md. 425, 221 A.2d 653, 656, is quite apropos to the case we are dealing with. There the court pointed out that an accosted suspect need not be advised he has the right to the presence of counsel before the first question can be propounded because such a right does not exist. The Maryland court went on to say the exclusionary principles enunciated in Escobedo v. State of Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977, and Miranda v. State of Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed. 2d 694, 10 A.L.R.3d 974, are not applicable to a confession gleaned from a suspect who is merely accosted by the police, but deal instead with the safeguards which might be provided for an accused who is in police custody.

### Determination of Admissibility

■ Counsel for appellant suggests the trial court was aware that defendant was questioning the admissibility of Priestley's statement to the patrolman who accosted him, when testimony of the officer was objected to; and that it was therefore incumbent upon the trial court to independently determine the admissibility of the officer's testimony out of the hearing of the jury. Jackson v. Denno, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908, 1 A.L.R.3d 1205, is relied on as authority for this contention.

The particular statement which was made in the *Jackson* opinion and which counsel seeks to apply for Priestley is at 84 S.Ct. 1779. Such statement was this:

"Although Jackson's counsel did not specifically object to the admission of the confession initially, the trial court indicated its awareness that Jackson's counsel was questioning the circumstances under which Jackson was interrogated."

Unlike the situation in *Jackson,* however, the trial court in Priestley's case did not indicate its awareness that Priestley's counsel was questioning the circumstances under which Priestley was interrogated. Moreover, there was indeed prolonged custodial interrogation of Jackson; drugs were administered to him; and he was refused water. As we have already pointed out, the testimony in Priestley's case does not indicate or suggest custodial interrogation of any kind.

As to whether the trial court had reason to believe counsel for Priestley was questioning the voluntariness of any statement Priestley may have made when accosted by the patrolman, the record speaks for itself.

The first objection of counsel for Priestley came after the patrolman testified the man he accosted opened the police car door and asked the policeman to take him to the City Cafe. When the officer was asked, what else did he say, defense counsel made the following objection:

"I will object to the question as being incompetent, irrelevant and immaterial and further that a proper foundation has not been laid for this line of questioning.

"May we approach the bench, Your Honor.

"(WHEREUPON A DISCUSSION WAS HAD AT THE BENCH)"

Following the discussion of counsel at the bench, which is understood to be out of the hearing of the jury, the court sustained the objection of defense counsel. Thereafter, the witness identified the man accosted as David Priestley, a matter which had a bearing on the foundation for testimony as to conversations between defendant and the witness. Other questions and answers ensued, the officer testifying that Priestley asked to be taken to the City Cafe and stated he had taken a large sum of money.

No objection was made until the next question had been asked. It was: "What else happened at the time?" At that point defense counsel made the following objection:

"I will object to these answers that was given as unresponsive and I would like to renew my prior objection again as to any improper foundation that hasn't been laid for this line of inquiring."

No motion was made to strike any of the answers given; and no request was made for the court to instruct the jury to disregard any of the answers previously given. The court overruled the objection made, whereupon the witness answered that he placed the subject under arrest, frisked him and advised him of his rights. It is not suggested that the advising of constitutional rights was insufficient.

We fail to find in either of the objections which were made anything to indicate that counsel for Priestley was questioning the circumstances of a custodial interrogation. Indeed, we find nothing to suggest that counsel for Priestley was challenging the voluntariness of any statement made by Priestley prior to his being arrested and advised of his constitutional rights.

Under these circumstances, and with a complete absence of custodial interrogation, we are constrained to say the *Jackson* opinion has no application to the facts in this case. It will be of interest to notice in the *Jackson* decision, at 84 S.Ct. 1785, the court indicated voluntariness of a statement has to do with "whether a defendant's will has been overborne." Again, at 84 S.Ct. 1787, it was stated police conduct requiring exclusion of a confession has evolved from acts of clear physical brutality to more refined and subtle methods of "overcoming a defendant's will."

As far as Priestley's appeal is concerned, it can be said there was nothing in any of the objections made and nothing in any of the testimony adduced to indicate there was a question about his will being overborne by coercion of any nature, subtle or otherwise. We find no reason for reversing the defendant's conviction.

Affirmed.