Mark Lynn BREWSTER,
Appellant (Defendant),

v.

The STATE of Wyoming,
Appellee (Plaintiff).

No. 84–313.

Supreme Court of Wyoming.

Dec. 26, 1985.

Leonard D. Munker, State Public Defender, and Martin J. McClain, Appellate Counsel, Wyoming Public Defender Program, Cheyenne, for appellant (defendant).

A.G. McClintock, Atty. Gen., Gerald A. Stack, Deputy Atty. Gen., John Renneisen, Senior Asst. Atty. Gen., and Michael A. Blonigen, Asst. Atty. Gen., Cheyenne, for appellee (plaintiff).

Before THOMAS, C.J., and ROSE *, ROONEY **, BROWN and CARDINE, JJ.

ROSE, Justice.

Appellant Mark Brewster was convicted by a jury of attempted first-degree sexual assault and sentenced to 20 to 25 years in the state penitentiary. He raises the following issue on appeal:

"Whether Appellant's constitutional right of silence was violated by impermissible comment upon Appellant's invocation of that right."

Appellant objects to testimony elicited from police officers on direct examination and to remarks made by the prosecution during closing argument to the jury. Officer Rogers testified as follows concerning his interrogation of appellant at the police department following arrest:

"Q. Did you discuss with him all that he knew about the incident?

"A. I attempted to discuss everything with him, at many points he became—

"Q. I am sorry, I can't hear you, speak up a little louder.

"A. At many points he became emotional and evasive and difficult to discuss all of the allegations against him, some things he would talk about, some things he refused to talk about, some things he stated he didn't remember.

"Q. What did he refuse to talk about?

* Retired November 1, 1985.

** Retired November 30, 1985.

"A. Well, at one point he refused to talk any further about what his intentions were, further refused to talk about whether his penis was out of his pants, at one point kept—

"Q. Did he ever deny that his penis was out of his pants?

"A. Never denied that it was, at one point stated he couldn't remember if it was, was as far as he came to denying, he simply stated he didn't want to talk about it at that point.

"Q. That is a quote, I don't want to talk about that?

"A. Yes.

"Q. Did he tell you how everything developed after he was on the floor on top of her?

"A. All he would state was that he didn't recall how he got to the floor, that he was on top of her and he was attempting to show her how he felt, and past that point he wouldn't elaborate on what his intentions were further."

Officer Cashel also questioned appellant after his arrest and testified as follows:

"Q. Did you talk to him about the sexual allegation?

"A. Yes, sir, I did.

"Q. What did he tell you?

"A. That he didn't want to talk to me about it.

"Q. He didn't deny it?

"A. No, sir, he didn't."

In his closing arguments to the jury, the prosecutor referred to the police officers' trial testimony:

"He is charged with sexual assault, he knows the nature of the crime that [the alleged victim] leveled against him, he didn't, he said, I don't want to talk about that not I don't remember, but that is what he told [Police Officer] Rick Rogers, that is what he in fact told [Police Officer] Judi Cashel, that is I said, what did he say about this nature of sexual encounter, he said, I don't want to talk about it. It went beyond what is written in this statement, because what is written here, signed by this man, three hours before he changed his story. I never made any more sexual advances to her other than to try to kiss her. I never hit her or tried to choke her, never tried to have intercourse with her, but when asked, did you have your penis out, I don't remember. But when asked, was it a sexual encounter, sexual effort, I don't want to talk about it. Of course, it happened that way.

\*　　\*　　\*　　\*　　\*　　\*

" \* \* \* That is it, that is the law. It is, all the burden is and the burden to prove beyond a reasonable doubt, there can be no doubt, there is no dispute, there's not a different story, the story told to Rick Rogers is, yes, I did in fact have her down on the floor, I did in fact lay on top of her, I did, I did, I did, I am not going to talk to you about it any more, I don't want to talk about penis, I don't want to talk about the sexual part. I did, I did, I did, I did all those things. \* \* \* "

The prosecutor further stated in closing:

" \* \* \* This isn't a case of renunciation. Completed crime and attempt, did the defendant talk at length to law enforcement about rejection, he certainly did, that is all he told them about. You can see it in the written statement, Judi Cashel, and it is in the statement of Rick Rogers, his whole discussion was about rejection. He wanted to talk about rejection, he didn't want to talk about his penis or any of these other details, any of the details [appellant's attorney] hasn't talked these seven details [sic], he jumped right over that because that is the reality, the uncontroverted reality of what happened."

We agree with appellant that these comments made at trial on behalf of the State require the reversal of his conviction under our holding in *Westmark v. State*, Wyo., 693 P.2d 220 (1984).[1]

---

1. In view of our disposition of this appeal, we will not address a second issue raised by appellant concerning the sufficiency of the evidence to support his conviction.

## THE RIGHT OF THE ACCUSED TO REMAIN SILENT

In a long line of cases culminating in *Westmark v. State*, supra, this court has held that prosecutorial comments at trial concerning the accused's silence following arrest violate rights guaranteed by the Fifth Amendment to the United States Constitution [2] and Art. 1, § 11 of the Wyoming Constitution.[3] In Westmark v. State we held that such errors are inherently prejudicial:

> "We * * * hold that any comment upon the accused's exercise of his or her right to remain silent is prejudicial error which will entitle the accused to a reversal of the conviction." 693 P.2d at 222.

In reaching this holding, we renounced our position in *Richter v. State*, Wyo., 642 P.2d 1269 (1982), that such constitutional violations might be dismissed as harmless error, and reinstated the prejudicial-per-se rule of *Clenin v. State*, Wyo., 573 P.2d 844 (1978). Under *Clenin* and Art. 1, § 11 of the Wyoming Constitution, any comment on the accused's exercise of his right of silence requires reversal of his conviction, even though the United States Constitution might permit analysis under the harmless-error doctrine:

> " * * * Historically, our Court has jealously guarded the right provided in Art. 1, § 11 of the Constitution of the State of Wyoming against any infringement. *Irvin v. State*, [Wyo., 560 P.2d 372 (1977) ], *Jerskey v. State*, Wyo., 546 P.2d 173 (1976); *Dryden v. State*, Wyo., 535 P.2d 483 (1975); *Moss v. State*, Wyo., 492 P.2d 1329 (1972); *Priestley v. State*, Wyo., 446 P.2d 405 (1968); *Dickey v. State*, Wyo., 444 P.2d 373 (1968); and *Miskimmins v. Shaver*, 8 Wyo. 392, 58 P. 411, 49 L.R.A. 831 (1899). We hold that under this section of our state constitution any comment upon an accused's exercise of his right of silence, whether by inter-

rogation of the accused himself, or by interrogation of others inherently is prejudicial, and will entitle an accused to reversal of his conviction. Such a breach of the accused's constitutional protections is plain error and prejudicial per se. While, in the light of the language of *Doyle v. Ohio*, [426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976) ], this may represent an extension of the rule of that case, it is our prerogative to so do in applying our state constitution. * * * " *Clenin v. State*, supra, 573 P.2d at 846.

The State in its brief urges that our holdings in Westmark and Clenin do not control the outcome of this appeal because (1) the trial testimony and argument at issue were not impermissible comments on appellant's silence, but were references to his evasive behavior during questioning; (2) appellant waived his right to remain silent; and (3) the comments, if impermissible, were harmless beyond a reasonable doubt. We find these positions untenable under the facts of this case and the law as developed in our prior opinions.

## IMPERMISSIBLE COMMENT ON SILENCE

The State urges that the trial statements to which appellant objects, when considered in context, were not impermissible comments on silence but pertained to appellant's evasive behavior following arrest. Appellee relies on this court's opinion in *Parkhurst v. State*, Wyo., 628 P.2d 1369, cert. denied 454 U.S. 899, 102 S.Ct. 402, 70 L.Ed.2d 216 (1981), where we held that a testifying police officer's innocent references to the accuseds' pre-arrest silence did not warrant reversal under *Clenin v. State*, supra. The officer in Parkhurst had described his roadside interrogation of appellants as follows:

> " 'Q    After that, what did you do?

---

**2.** The Fifth Amendment to the Constitution of the United States reads:

"No person shall be * * * compelled in any criminal case to be a witness against himself * * *."

**3.** Article 1, § 11 of the Wyoming Constitution reads:

"No person shall be compelled to testify against himself in any criminal case * * *."

"'A  I continued to talk to the subjects, tried to ascertain or to make certain where they had been, how they had gotten there, what roads they had travelled, whether they ·had passed through Glenrock or not.  *Some questions were answered, some weren't.*

\*     \*     \*     \*     \*     \*

"'Q  What did the two of you do after the parts you were testifying to?

"'A  When I returned from the vehicle, the second time, from my vehicle, Officer Dekmar advised that he had asked for consent to search.  He advised me this in a loud enough tone of voise [sic] that both subjects could hear him at the front of the vehicle.  We were standing about even with the front door, *and neither subject said anything.*'  (Emphasis added.)"  628 P.2d at 1380.

We said that these isolated remarks did not rise to the level of a "comment" on silence as that term is used in *Clenin v. State,* supra, and *Jerskey v. State,* Wyo., 546 P.2d 173 (1976), discussed infra:

"We believe that it is consistent with *Jerskey* and *Clenin* to read the term 'comment' as implying more than a reference to the accused's silence.  Implicit in the term is a reaction to that which is being mentioned which would present the possibility of the State exploiting the silence.  Here the officer's statements were: 'Some questions were answered, some weren't' and 'neither subject said anything.'  Those statements constituted the *totality* of any reference to silence.  These isolated statements were never at any time intended to be used to the prosecutor's advantage by the prosecution.  Further, no later reference was made to any of them.  There is nothing derogatory in those words; there is no expression of the police officer's attitude towards such silence.  They are not so much statements concerning appellants' silence as they are testimony about behavior.  Moreover, the silence referred to was of a passive nature; there was no affirmative exercise of the right to silence.  Without more there is no reason to infer that the jury read the appellants' silence as an admission of guilt.  It is reasonable to conclude that the jury took the appellants' unresponsiveness within the complete context of the stop as an indication that the appellants did not hear the question, the officer asked the question too fast, or they were frightened or confused—a state shared by most people upon being stopped by the police even though guiltless.  There is nothing in these circumstances to indicate that appellants' nonresponsiveness manifests an exercise of their right of silence."  628 P.2d at 1382.

Thus, no error occurred where the accuseds' silence had not been used against them at trial, where the jury was unlikely to infer an admission of guilt from their nonresponsiveness, and where nothing indicated that the defendants had invoked their rights of silence.

The circumstances in the case at bar compel the opposite conclusion.  Appellant refused to respond to questions during two sessions of interrogation at the police department.  Prior to agreeing to participate in these sessions, appellant had signed a statement acknowledging his right to stop answering questions at any time.[4]  Appellant chose to exercise that right and the State penalized him at trial.  During direct examination, the prosecutor asked about those areas that appellant had refused to discuss and emphasized the fact that appellant had not denied certain aspects of the alleged assault.  In closing arguments, the prosecutor repeatedly directed the jury's attention to appellant's silence when asked certain questions, thereby inviting the inference that a truthful answer would have established guilt.  In short, the State exploited appellant's refusal to answer questions in order to prove its case.  These statements constituted impermissible com-

---

**4.**  This statement was part of the waiver form provided by police officers and signed by appel-lant.  See discussion infra.

ment on appellant's exercise of his right of silence and cannot be dismissed as isolated references to behavior under *Parkhurst v. State,* supra.

## WAIVER OF THE RIGHT TO REMAIN SILENT

Prior to his interrogation by police officers, appellant signed a statement agreeing to answer questions and waiving certain rights. The statement provided in part:

"If you decide to answer questions now, you will still have the right to stop answering questions at any time during this interview. You also have the right to stop answering at any time until you talk to an attorney."

We recognized in *Westmark v. State,* supra, that an accused might waive his constitutional rights to remain silent. We said:

" * * * [U]nless there is a clear, unmistakable, knowledgeable waiver of the defendant's constitutional right to remain silent, silence may not be used against him in trial—and to do so is error. [Citation.]" 693 P.2d at 223.

In the instant case, the waiver form provided by the police department expressly reserved to appellant the right to refuse to answer questions at any time during the interview. He invoked that right when he informed the officers that he did not want to talk. He did not need to terminate the interview in order to exercise his retained right of silence, as the State contends. Since appellant did not execute any waiver of his constitutional right to remain silent—let alone a clear, unmistakable, knowledgeable waiver—the State erred in using his silence against him at trial.

## PREJUDICIAL ERROR

The State urges this court to restrict application of the Westmark rule—that *any* comment upon the accused's exercise of his right of silence is prejudicial error—to those situations in which the prosecutor comments on the defendant's failure to testify at trial or uses the accused's silence upon arrest to imply that his trial story is a recent fabrication. These "direct" attacks on the defendant as a result of his silence are highly prejudicial and uniformly warrant reversal of a conviction, appellee submits, whereas the "indirect" references to silence at issue in the present case should be reviewed under the harmless-error doctrine. Appellee reasons further that restriction of the rule of automatic reversal to cases involving egregious errors would satisfy its deterrent purposes, since prosecutors can readily avoid those sorts of errors.

We reinstated the prejudical-per-se rule in *Westmark v. State,* supra, because the citizen-accused has a constitutional right to a trial free from any and all comments on his silence, and because prosecutors could not resist violating this right and gambling that the Supreme Court would find the error harmless. Accordingly, we said that any comment upon the accused's exercise of the right to remain silent would entitle the defendant to a reversal of the conviction, and we adhere to that rule in the present case as the only viable means of giving effect to this constitutional right. As Justice Guthrie said in his concurring opinion in *Gabrielson v. State,* Wyo., 510 P.2d 534, 539–540 (1973):

" * * * A constitutional guaranty indeed becomes barren and valueless if by the assertion thereof it can be utilized to his detriment."

We have not hesitated in the past to reverse convictions obtained in trials marred by prosecutorial comments similar to those at issue in the present case. In *Jerskey v. State,* supra, 546 P.2d at 178–179, appellant objected to the following testimony by police officers:

" 'Q. Did you ask him anything else concerning that package [containing one kilo of marihuana]?

" 'A. Yes, sir. We asked something to the effect of if he had expected more or if he had noticed anything missing and his reply to this was *no comment.*' [Emphasis supplied]

\* \* \* \* \* \*

"Officer Roylance testified:

" 'Detective Valdez asked if he wasn't selling it that was an awful lot to smoke, and he had *no comment.*' [Emphasis supplied]

"Officer Vincent Valdez was on the stand and was asked if he had any conversations with the defendant on the way to the police station, and his answer was, in part:

" '... I asked him, "You weren't planning to smoke it all by yourself?" I said, "You would have to be a pretty heavy smoker to do that," *And he offered no reply to this question.*' [Emphasis supplied]' "

We held that these comments by the State's witnesses constituted reversible error:

" * * * The prosecution elicited the testimony that defendant had remained silent during custodial interrogation, not to show that its own evidence stood uncontradicted, but to create the inference that an honest answer would have established the appellant's guilt. This was impermissible and violated the defendant's privilege against self-incrimination." 546 P.2d at 183.

In *Gabrielson v. State*, supra, 510 P.2d at 538, we said with respect to improper cross-examination of the defendant:

"Particularly objectionable would be the following question which the prosecution asked of defendant:

" 'When asked by the Fort Collins Police Department on November 22, 1968, concerning an alleged homosexual act at or in the Northern Hotel, you refused to furnish a statement, did you not?' "

"No constitutional right of an accused person is more sacred than his right not to make a statement or testify against himself, and it was highly improper for any comment or question to be made or asked pertaining thereto."

Appellant Brewster exercised his constitutional right not to make a statement against himself to interrogating officers. His assertion of his right was subsequently used to his detriment at trial, and he is entitled to a reversal of his conviction.

Reversed and remanded for a new trial.

ROONEY, Justice, dissenting, with whom BROWN, Justice, joins.

I believe the result reached by the majority opinion under the facts of this case heavily underscore the absurdity of the holding in *Westmark v. State*, Wyo., 693 P.2d 220 (1984), to the effect that any comment upon an accused's exercise of his right to silence is prejudicial error per se. The specially concurring opinion of Justice Brown in *Westmark*, in which I joined, pointed to the waste of judicial time and resources resulting from reversals and mistrials in cases in which the evidence of guilt is overwhelming and yet reversible error results from a single ambiguous, innocuous or inadvertent comment on the accused's exercise of his right to remain silent. The specially concurring opinion of Justice Brown quoted the commonsense language in *Richter v. State*, Wyo., 642 P.2d 1269, 1275 (1982), which was overruled by *Westmark:*

" * * * The constitutional right to silence must and should be jealously guarded; but, it is self-defeating to refuse to recognize error as harmless when it is."

Although the assumption is of doubtful validity,[1] I will assume for the purposes of

---

**1.** Appellant had executed two waivers of his right to remain silent; thus, he agreed to answer questions and to have his answers used in court against him. Accordingly, answers such as "I don't remember" and "I don't want to talk about that" were available for use in court pursuant to his waiver. As recited in the waivers, he had the right to stop answering questions at any time. He did not terminate the interview or exercise the right to stop answering *all* ques-

tions; rather, he continued to answer questions with the answers *to some of them* being such as "I don't want to talk about that" or "I don't remember." These answers should properly be received into evidence, not as an admission of guilt—which they obviously are not—but to explain the variations from a natural course of interview. That is, they should be so received as testimony about behavior and should not be considered as comments on silence. *Parkhurst*

this dissent that some impermissible comments were made upon the exercise by appellant of his right to silence. Taken in context with all of the evidence in this case, appellant was obviously not prejudiced in any way by such comments. Any testimony as to appellant's answers such as "I don't remember" or "I don't want to talk about that" was insignificant in the determination of his guilt.

Following is a brief summary of the evidence presented to the jury.

The victim testified that appellant rented an upstairs apartment over that rented by the victim; they met on February 21, 1984; between that date and the date of the incident, March 2, 1984 (an interval of about ten days), they had dinners together, looked after each other's dogs, and generally socialized together; on February 28, 1984, appellant requested sexual relations with the victim, and she refused saying that she wanted the relationship to be only that of friends; on February 29, 1984, appellant tried to kiss the victim and she refused his advances; on March 1, 1984, they went to a restaurant together and ate pizza, with the appellant drinking beer and the victim drinking wine; after they returned to their apartments, appellant entered the victim's apartment and tried to kiss her; when she refused his advances, he threw her on the couch and later on the floor in an attempt to have sexual intercourse with her; she testified in detail as to the struggle which ended when he ejaculated on her leg; and she telephoned the police from a nearby motel and described the incident in detail to the police.

The motel employee testified to having unlocked the office door during the early morning hours of March 2, 1984, to allow the victim to telephone the police to report the incident.

Police Officer Robert J. Palmatier testified to the taking of photographs of the victim's apartment and to obtaining certain items as physical evidence.

*v. State*, Wyo., 628 P.2d 1369, cert. denied 454

Police Officer Judith Cashel testified that she interviewed both the victim and the appellant at the police headquarters during the early morning hours of March 2, 1984. She taped the interview with the victim, and the transcript of the tape was offered in evidence. She testified concerning that which the victim told her, which was substantially the same as the victim's prior testimony. She testified to the scratches on appellant and to the bruises apparent on the victim. She secured a written "waiver of rights" from appellant, and he executed a signed statement, both of which were admitted into evidence. In the statement he recited facts concerning his having had dinner and drinks with the victim on the previous evening and concerning his going to her apartment after they had returned home. He then said:

"I took Barbara by the arms and tried to kiss her. She turned her face away and I tried to kiss her again. She turned away again. That's when she scratched me. I really didn't feel it when she scratched me. I was frustrated. I told her how I felt about her. We talked for a while and then I went upstairs to bed. It was around 3:30 [a.m.] when I set my alarm.

"I never made any more sexual advances to her other than to try to kiss her. I never tried to have intercourse with her. I never hit her or tried to choke her."

The quotation from Officer Cashel's testimony in the majority opinion contended to be an impermissible comment on silence is emphasized as it is in context in the following excerpt of her testimony on direct examination:

"Q. According to this document you gave him his rights to counsel and to silence.

"A. Yes, sir.

"Q. What condition was he in when you interviewed him?

"A. He was slightly agitated, he seemed a little nervous.

"Q. Did you inform him that the allegation was of a sexual assault?

U.S. 899, 102 S.Ct. 402, 70 L.Ed.2d 216 (1981).

"A. Yes, sir.

"Q. What did he tell you?

"A. He told me that he did, in fact, know [the victim], that they had been out on a date, had pizza and drinks and had gotten hom[e] approximately one or 1:30 in the morning, and that he had in fact come down to her apartment, which is below his apartment.

"Q. Can you speak a little louder, I have a hard time hearing and don't think this room is the best room to hear.

"A. Okay. He said he had gone down to her apartment, which was the apartment below his, and that there had been an altercation, in which he had tired [sic] to kiss her, and that at some point during that, she had scratched him.

"Q. *Did you talk to him about the sexual allegation?*

"A. *Yes, sir, I did.*

"Q. *What did he tell you?*

"A. *That he didn't want to talk to me about it.*

"Q. *He didn't deny it?*

"A. *No, sir, he didn't.*

"Q. Was that statement taped?

"A. No, sir, it wasn't.

"Q. What did you do with what he told you?

"A. I made a handwritten copy of what he wanted his statement to be, and then I gave it to him to re-read, initial and then sign, which he did.

"Q. Is that included in State's Exhibit 11?

"A. Yes, sir.

"Q. He has signed the pages?

"A. Yes, sir.

> \*　　\*　　\*　　\*　　\*　　\*

"Q. Why was it that you had another interview, \* \* \* Rick Rogers had him go through another interview?

"A. I asked him first of all if he would be willing to take a polygraph, he said he would, and Sgt. Rogers was a polygraphist on duty, and thought he might be more comfortable talking to a male investigator.

"Q. More comfortable?

"A. Yes, sir, he seemed nervous, and when I tried to talk to him he would look away, wouldn't look me in the eye, and I just asked him if he would be more comfortable talking to Sgt. Rogers, and he agreed to talk to Sgt. Rogers.

"Q. About the whole story?

"A. He said he would talk to Sgt. Rogers about the whole story, and he would take a polygraph." (Emphasis added.)

And on cross-examination:

"Q. How long had you been talking to Mr. Brewster when you wrote out the handwritten statement that we have in evidence?

"A. Probably talked for 20 to 30 minutes.

"Q. And you went ahead and wrote it out?

"A. Then we went over it again and I wrote down what he wanted me to write down with exception of this paragraph, which is our normal beginning and explained that to him, I wrote that down.

"Q. Did he seem to understand everything that you told him?

"A. Yes, sir.

"Q. Did you have any difficulty understanding him?

"A. No, sir.

"Q. You mentioned at the time Mr. Brewster, the words I wrote down from your testimony, slightly agitated. What made you say slightly agitated?

"A. He moved his seat, talked to himself a little bit and wrung his hands a little bit, he wasn't extremely agitated, wasn't like bouncing off the walls.

"Q. Was his voice, the tone of his voice, elevated?

"A. His voice sounded the same to me, the whole time I talked to him, that is the only time I talked to him, so don't know if that is how he normally sounds or not."

Police Officer Rick Rogers testified that he interviewed appellant at about 8:50 a.m. on March 2, 1984, at police headquarters. He obtained a written "waiver of rights" form from appellant which was admitted

into evidence. The quotation from Officer Rogers' testimony in the majority opinion contended to be an impermissible comment on silence is emphasized as it is in context in the following excerpt of his testimony on direct examination:

"Q. Did he tell you whether he had any contact with [the victim] then?

"A. Yes, he said they got in a conversation at which time he tried to kiss [the victim], and she had pushed him away, that he was just trying to show her that, how he felt about her, and he loved her, and she again pushed him away, and he was unable to handle any type of rejection.

"Q. He told you, I am unable to handle rejection?

"A. Yes.

"Q. What did he do as opposed to handling the rejection?

"A. He told me he was trying to make her understand how he felt, and that he wanted her to feel the same way, that he forcibly kissed her in the kitchen, and also on the couch in the living area and that she again pushed him away, and further stated he, she pushed him away, he tried harder to show her how he felt, and he and her ended up on the floor with him on top of her.

"Q. Did you talk to him about how they ended up on the floor?

"A. I attempted to, he was very vague, he said he can remember being on the floor on top of her, but couldn't remember how he got there.

"Q. Did he tell you how long he was on the floor?

"A. He was quite unclear about that too, repeatedly stated to me he couldn't remember how he got there, what the circumstances were, but he had been on the couch, he kissed her and pushed her back against the couch, and they had ended up on the floor.

"Q. Did he tell you what position they were in on the floor?

"A. All he stated to me was that she was lying on the floor, he was lying on top of her.

"Q. Did you talk to him whether, about that in terms of a sexual accusation?

"[A]. I asked him about whether his penis was out of his pants, he refused to talk about that, he was unsure, stated repeatedly that he thought he would remember, but he just didn't know for sure whether it was or not.

"Q. He didn't know whether his penis was out of his pants?

"A. That is what he stated, first he didn't remember, then he didn't know, then didn't remember, was very evasive about that question.

"Q. Did you talk to him for any length of time that you recall?

"A. I would say approximately 30 or 40 minutes, I don't recall exactly how long it was, but at a point when Mr. Brewster requested an attorney, the interview was terminated.

"Q. He did request an attorney at some point?

"A. He never really refused to talk until he talked to his attorney, but he was continually asking me for advice as to whether he needed an attorney, and at that point I felt I would make his attorney available and terminated the interview.

"Q. Do you recall any more of the conversation with him?

"A. No, basically that he had forcibly tried to kiss her, she had rejected him, and he couldn't physically face that rejection and ended up on the floor with him on top of her.

"Q. Did you discuss the injuries to his face?

"A. In discussing those injuries, mentioned those, and mentioned the allegations against him was that she had scratched him, he had told me at one point that she refused his advances, his attempt to show her how he felt, and she had scratched him.

"Q. *Did you discuss with him all that he knew about the incident?*

"A. *I attempted to discuss everything with him, at many points he became*—

"Q. *I am sorry, I can't hear you, speak up a little louder.*

"A. *At many points he became emotional and evasive and difficult to discuss all of the allegations against him, some things he would talk about, some things he refused to talk about, some things he stated he didn't remember.*

"Q. *What did he refuse to talk about?*

"A. *Well, at one point he refused to talk any further about what his intentions were, further refused to talk about whether his penis was out of his pants, at one point kept*—

"Q. *Did he ever deny that his penis was out of his pants?*

"A. *Never denied that it was, at one point stated he couldn't remember if it was, was as far as he came to denying, he simply stated he didn't want to talk about it at that point.*

"Q. *That is a quote, I don't want to talk about that?*

"A. *Yes.*

"Q. *Did he tell you how everything developed after he was on the floor on top of her?*

"A. *All he would state was that he didn't recall how he got to the floor, that he was on top of her and he was attempting to show her how he felt, and past that point he wouldn't elaborate on what his intentions were further.*

"Q. Is that statement in a written form?

"A. No, it isn't. It is on a Casper Police Department Supplemental Report, synonymous of it that I prepared.

"Q. You didn't ask him to make a written statement of it?

"A. No, I didn't.

"Q. Why was that?

"A. Well, at that point he requested and I agreed to contact an attorney, he requested to speak to his attorney, he stated to me upon conclusion with conversing

with his attorney he would return for a polygraph examination and for a formal statement, at which time Mr. Painter, after conversing with him—

"Q. All right." (Emphasis added.)

In addition to the two waivers of rights and the handwritten signed statement, photographs of the appellant showing the scratches on his face and photographs of the victim showing the bruises on her were admitted into evidence.

Appellant made only two objections during the presentation of the State's case. Neither pertained to appellant's right to remain silent. A hearsay objection was made to the question asked Police Officer Palmatier: "What did [the victim] tell you?" The objection was overruled. The other objection was to the receipt into evidence of the taped interview with the victim

"* * * because other things [are] written in, there is evidence this was altered since the transcript was made. I would object to the material in any case because it is hearsay and because there is no foundation."

The objection was sustained.

The defense did not put on any evidence after the State rested.

The alleged comments by the witnesses on the exercise of the right to silence, taken in context, are absolutely irrelevant as pertaining to guilt or as contributing to the finding thereof. Moreover, they are no more comments on the exercise of the right to silence than were those in *Parkhurst v. State*, Wyo., 628 P.2d 1369, cert. denied 454 U.S. 899, 102 S.Ct. 402, 70 L.Ed.2d 216 (1981). See quotation therefrom in the majority opinion.

Appellant seemingly recognized that the testimony presented by the prosecution was only an accurate portrayal of that which the jury should consider. Appellant's denial of an attempt to have intercourse with the victim was before the jury in his second statement to Officer Cashel. At the close of the State's case, appellant said:

"Defendant can't say any more than has already been said, Your Honor, we rest as well."

Included in the instructions to the jury was the following:

"It is a constitutional right of a defendant in a criminal trial that he may not be compelled to testify. You must not draw any inference from the fact that he does not testify. Further, you must neither discuss this matter nor permit it to enter into your deliberations in any way."

A jury is presumed to have followed the instructions of the court. *Hursh Agency, Inc. v. Wigwam Homes, Inc.*, Wyo., 664 P.2d 27 (1983).

The final argument of the prosecution did not contain sufficient references to appellant's exercise of his right to silence to taint the case. No objection was made to it. It was directed more to the question of whether the attempt at rape was accomplished. Appellant's defense was premised on an abandonment by appellant of the attempt prior to the completion of the crime of attempted rape. This posture was the basis of appellant's motion to dismiss which was made at the close of the State's case. Appellant's final argument was not directed toward a denial of the facts of the incident as placed before the jury. Rather, it was directed at the contention that the facts reflected an abandonment of the attempt under the provisions of § 6–1–301(b), W.S.1977 (June 1983 Replacement). Section 6–1–301, W.S.1977 (June 1983 Replacement), provides:

"(a) A person is guilty of an attempt to commit a crime if:

"(i) With the intent to commit the crime, he does any act which is a substantial step towards commission of the crime. A 'substantial step' is conduct which is strongly corroborative of the firmness of the person's intention to complete the commission of the crime; or

"(ii) He intentionally engages in conduct which would constitute the crime had the attendant circumstances been as the person believes them to be.

"(b) A person is not liable under this section if, under circumstances manifesting a voluntary and complete renunciation of his criminal intention, he avoided the commission of the crime attempted by abandoning his criminal effort. Within the meaning of this subsection, renunciation of criminal purpose is not voluntary if it is motivated, in whole or in part, by circumstances, not present or apparent at the inception of the person's course of conduct, which increase the probability of detection or apprehension or which make more difficult the accomplishment of the criminal intention. Renunciation is not complete if it is motivated by a decision to postpone the criminal conduct until a more advantageous time or to transfer the criminal effort to another but similar objective or victim."

The jury was fully instructed as to this statute and to appellant's contention of a defense of renunciation under it.

Once the jury rejected this contention of appellant, the evidence of the attempt was almost without contradiction. In opting to base the defense on renunciation of the attempt, acknowledgment of the fact that an attempt was instigated is acknowledged. When the renunciation defense was rejected by the jury, the conclusion follows that the instigated attempt was fulfilled. The statements alleged to be comments on appellant's exercise of the right to silence can never be said to have been prejudicial to his contention of innocence based on renunciation of the attempt. Nevertheless, under the holding in *Westmark v. State*, supra, this commonsense resolution of the matter is not possible. It should be possible, and it makes the holding in *Westmark* to be unwarranted.

I would affirm.